

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-29-2005

# Pardini v. Alghny Intermediate

Precedential or Non-Precedential: Precedential

Docket No. 03-2897

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Pardini v. Alghny Intermediate" (2005). *2005 Decisions.* Paper 586.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/586

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No: 03-2897/3988

DAVID AND JENNIFER PARDINI, on
behalf of themselves and on behalf of
their minor child, GEORGIA PARDINI,

Appellants

v.

ALLEGHENY INTERMEDIATE UNIT;
BARBARA MINZENBERG, Program Director

On Appeal from the United States District Court
for the Western District of Pennsylvania
D.C. Civil No. 03-cv-00725
District Judge: Arthur J. Schwab

Argued: November 12, 2004

Before: McKee, Chertoff[1], Circuit Judges and Buckwalter[2],
Senior District Judge

_____

[1]Judge Chertoff heard oral argument in this case but resigned
before the time the opinion was filed. The opinion is filed by a
quorum of the panel. 28 U.S.C. § 46(d).

[2]Honorable Ronald L. Buckwalter, United States District
Judge for the Eastern District of Pennsylvania, sitting by
designation

(Filed August 29, 2005)

OPINION

David D. Pardini **(Argued)**
3256 Waltham Avenue
Pittsburgh, PA 15216

*Attorney for Appellants*

William C. Andrews, Esq. **(Argued)**
Christina Lane, Esq.
Andrews & Price
1500 Ardmore Boulevard
Suite 506
Pittsburgh, PA 15221

*Attorneys for Appellees*

Janet F. Stotland, Esq. **(Argued)**
Education Law Center
1315 Walnut Street
Suite 400
Philadelphia, PA 19107

*Attorney for Amicus-Appellant*

Linda F. Thome, Esq.
Unites States Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, N.W.
Washington, D.C.  20530

*Attorney for Amicus-Appellee*

McKee, <u>Circuit Judge</u>.

David and Jennifer Pardini brought this action on behalf of their minor daughter, "Georgia." They are appealing the District Court's ruling that she was not entitled to continue to receive certain educational/developmental services pursuant to the "stay-put" provision of the Individuals with Disabilities in Education Act, until the dispute over those services is resolved. For the reasons that follow, we will reverse.

## I. Factual Background

Georgia Pardini was born on April 18, 2000. She has cerebral palsy, a condition that affects muscular coordination and body movement. Sometime after her first birthday, Georgia began receiving services from the Alliance for Infants and Toddlers ("AIT") in the form of an Individualized Family Service Plan ("IFSP") pursuant to the Individuals With Disabilities in Education Act, 20 U.S.C. §§ 1400-85, ("IDEA" or the "Act"). Shortly before Georgia's third birthday, as she was about to transition out of her IFSP, a dispute arose about whether the Individualized Education Program ("IEP") being developed for her by the Allegheny Intermediate Unit ("AIU") should include the conductive education Georgia had been receiving as part of her IFSP.[3]

The AIU had evaluated Georgia as part of the normal transition from an IFSP to an IEP that is mandated by the IDEA when a child turns three. The District Court found that the Pardinis received the evaluation on March 15,2003 along with instructions telling them to "Read the report, sign the original, and return in the enclosed envelope within 5 days [and] [i]f you disagree with any part of the report, write a statement on a separate piece of paper that describes the items with which you

---

[3] Conductive education is an educational approach for children with central nervous system disabilities. It is a holistic approach to help develop problem-solving skills.

disagree."

The Pardinis and agents of AIU met on March 24, 2003, but the Pardinis refused to sign the IEP because it did not provide for the conductive education Georgia had been receiving under the IFSP. Rather than sign, the Pardinis requested an independent evaluation and asked AIU to continue all of the services Georgia had been receiving pending the outcome of that evaluation. AIU responded by advising the Pardinis that it would instead seek a due process hearing pursuant to 20 U.S.C. §1415(f) "to prove the appropriateness of their evaluation and thus, deny the public expense of the independent evaluation." *Pardini v. Allegheny Intermediate Unit*, 280 F.Supp.2d 447, 450. (W.D. Pa. 2003). The Pardinis reiterated their request that conductive education continue as Georgia's "current educational placement" in a letter dated March 25, 2003. Although AIU subsequently sent the Pardinis at least two letters, one of which was dated March 31, 2003, and the other of which was dated April 15, 2003, a second IEP meeting scheduled for April 17 was postponed because the Pardinis did not receive adequate notice. When the Pardinis thereafter demanded a written explanation of the services that would be discontinued on Georgia's third birthday, AIU responded by asserting its intent to request a due process hearing. AIU also informed the family that it would not continue the conductive education during the due process proceedings and that feature of her IFSP would be discontinued as of Georgia's third birthday.

At the May 1, 2003 IEP meeting, AIU presented a Notice of Recommended Educational Placement ("NOREP") that included only those services it deemed appropriate; it did not include conductive education. The Pardinis signed noting their objection to the absence of conductive education. The District Court summarized that meeting and AIU's refusal to subsequently provide Georgia with any services as follows: "Plaintiffs attended [the] . . . meeting . . . under protest . . . . AIU

4

refused to offer Plaintiffs a NOREP that included all of the IFSP related services and Plaintiffs signed their objection to AIU's NOREP as such. Nevertheless, the AIU has not restarted Georgia's IDEA services." *Pardini*, 280 F. Supp. 2d at 453.

The AIU and the Pardinis could not agree upon Georgia's IEP, and the Pardinis refused to sign a NOREP that did not include conductive education. The AIU took the position that it could not provide any services under the circumstances, and it terminated all of Georgia's services four days after her third birthday. The Pardinis responded in a letter to AIU in which they objected to AIU's actions and demanded that Georgia's services be reinstated pursuant to the "stay-put" requirement of 20 U.S.C. § 1415(j). The AIU maintained that § 1415(j) did not apply because Georgia was transitioning from an IFSP to an IEP. "The Pardinis reasonably believe[d] that conductive education, . . . has proven . . . effective and . . . beneficial to Georgia. [] AIU . . . refused to even consider the appropriateness and effectiveness of conductive education . . . as part of its proposed IEP, prior to presenting that IEP to the parents." *Pardini,* 230 F. Supp. 2d. at 454.

While the due process hearings were proceeding to determine whether "a meaningful and appropriate IEP should include . . . conductive education . . . or whether the alternatives offered by AIU [were] adequate to insure [Georgia's] meaningful progress," *id*., the Pardinis filed the instant action in the District Court.[4] The Hearing Officer did not specifically

_____

[4] At oral argument, the parties informed the court that the Pardinis eventually agreed to an IEP that did not include conductive education. However, since we conclude that Georgia was entitled to receive conductive education as a part of Georgia's IEP until the dispute was resolved, they are entitled to reimbursement of the out-of-pocket expense resulting from the AIU's failure to comply with 20 U.S.C. § 1415(j) as well as

address the application of the stay-put rule. Rather, he relied upon the District Court's conclusion that "Georgia's IFSP is not pendent," because she had reached her third birthday, and proceeded to address the issue of "whether the parents should receive an [Independent Educational Evaluation] at public expense." App. 656. Thereafter, the District Court entered a final order ruling that § 1415(j) did not require the IEP to offer conductive education during the pendency of the administrative hearings.[5] This appeal followed.

Meanwhile, the state conducted due process hearings on

---

reasonable attorneys' fees.

We do not think that Mr. Pardini is precluded from recovering reasonable attorneys' fees otherwise provided for under the IDEA merely because he is seeking reimbursement for his own expenses while representing his daughter. In *Zucker v. Westinghouse*, 374 F.3d 221, 227 (3d. Cir. 2004) we recognized that, absent an expression of congressional intent to the contrary, a plaintiff's entitlement to attorneys' fees is not eliminated merely because he/she was *pro se* counsel. Although we were there discussing the right of a *pro se* plaintiff in a shareholder's derivative action, that conclusion is not limited to that specific type of action. Since Mr. Pardini requested "such other relief as the Court deems fitting and proper," in his complaint, he is entitled to recover reasonable attorneys' fees to the extent that he is the prevailing party.

[5] The District Court noted the ongoing administrative proceedings but concluded "in light of the somewhat inexplicable communication problems and institutional stubbornness exhibited by AIU . . . that the Pardinis face a bewildering bureaucratic nightmare [that] must be particularly daunting to young parents who are financially strapped and emotionally pressed to provide for the special . . . needs of their child." *Pardini*, 280 F. Supp. 2d at 454.

June 10 and June 12, 2003 to determine if AIU was obligated to continue providing the services Georgia had received as part of her IFSP pending the resolution of the disputed IEP, as well as whether the proposed IEP was appropriate. Ultimately, the Dispute Resolution Hearing Officer ruled that AIU was not obligated to continue all of Georgia's services under the IFSP. The hearing was then continued to determine whether the Paridnis should receive an independent evaluation.

On August 29, 2003, after conducting a trial, the District Court issued a second opinion in which the court ruled that the Pardinis were not entitled to any relief. The court reasoned that the stay-put provision of the IDEA did not require AIU to provide the identical educational program that AIT had been providing under Georgia's IFSP because the AIT was a different program with a different funding stream. The court also concluded that the respective agency, not the parents, had the ultimate responsibility for deciding upon an appropriate educational program for Georgia. This appeal followed.[6]

## II. Discussion

The District Court concluded that the stay-put rule of § 1415(j) does not apply to a child who has reached her third birthday and is therefore transitioning from an IFSP to an IEP. The court explained, "[a]n IFSP is a medical model, . . . [whereas] [a]n IEP is an educational model. *Pardini*, 280 F.

---

[6] Since the termination of Georgia's services, the Pardinis have paid for two sessions of conductive education services. They have also paid for Georgia to receive services at the Euromed Rehabilitation Center in Mielno, Poland, as well as services through United Cerebral Palsy/North Coast Ohio Conductive Education of Cleveland, and the Ronald McDonald House of Cleveland.

Supp. 2d at 454. The court reasoned that, since Georgia was embarking upon her first IEP and a public education, the "applicable stay-put placement . . . is the proposed public school placement and program" contained in the IEP that did not include conductive education. *Id*. Accordingly, the court reasoned that the AIU was not obligated to provide for conductive education pending the outcome of the due process hearings.

In order to properly resolve this dispute, we must examine the IDEA to determine if Congress intended that disputed features of an IFSP be provided under an IEP that is offered upon a child reaching the age of three and transitioning from one part of the Act to another.

## A. Statutory Background.

In enacting the IDEA, Congress originally only provided for children with disabilities who were between the ages 5 and 21. However, in 1986, Congress amended the ACT to extend to disabled children who were between three and five years of age. Accordingly, 20 U.S.C. § 1412 declares that a state is only eligible for financial assistance when "a free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21 . . .."

The program providing services to children beyond their third birthday ("school-aged children") is referred to as "Part B," and the program providing services to children between the ages of three and five is known as the "Part B Preschool Program." Part B defines a "free appropriate public education" as:

[S]pecial education and related services that:

a.    have been provided at public expense, under public supervision

8

>      and direction, and without charge;
> b.    meet the standards of the State educational agency;
> c.    include an appropriate preschool, elementary, or secondary school education in the State involved; and
> d.    are provided in conformity with the individualized education program . . ."

20 U.S.C. § 1401(8).

The IEP is a written statement prepared as the result of consultation among a representative of the local educational agency, the teacher, and the parents, which must contain," statements of: present levels and performance, annual goals and objectives, "specific educational services to be provided[] . . ., the extent to which such child will be able to participate in regular educational programs, [] the projected date for initiation and anticipated duration of such services, and . . . appropriate evaluation procedures and schedules for determining, . . . whether instructional objectives are being achieved.[7]

---

[7] Under the IDEA, parents of "disabled" children have the right to examine relevant records pertaining to the child. They are also meaningful participants in the evaluative process and they have a right to an independent educational evaluation of the child if they disagree with the services the school or educational agency offers. Parents are also entitled to advance notice whenever the school or agency refuses to initiate or change the identification, evaluation or educational placement of the child. 20 U.S.C. § 1415(b).

*Thomas v. Cincinnati Bd. of Educ.,* 918 F.2d 618, 621 (6th Cir.1990). 20 U.S.C. § 1401(19).[8]

The issue before us involves the Act's provisions for the child during the pendency of disputes involving the child's program or placement. At the outset, we referred to 20 U.S.C. § 1415(j) which provides in pertinent part as follows:

> D]uring the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents . . . otherwise agree, the child shall remain in the then-current educational placement of such child, or, if applying for initial admission to a public school, shall, with the consent of the parents . . . be placed in the public school program until all such proceedings have been completed.

This "stay-put provision dates back to 1975, when it was enacted as § 615(e)(3) of the IDEA's predecessor statute, the Education for All Handicapped Children Act. *Michael C. v. Radnor*, *Township School Dist.*, 202 F.3d 642, 652, n9 (3rd. Cir. 2000).

In 1986, Congress amended the IDEA by adding the "Part C" Program to serve children from birth to age three. 20 U.S.C. § § 1431-1445. Part C requires states that receive funds under the statute to provide "appropriate early intervention services as set forth in an Individualized Family Service Plan ("IFSP"). Section 1432(4) of the IDEA defines "early

---

[8] *Thomas* involved the Education for all Handicapped Children Act, Pub. L. No. 94-142, 1975 U.S.C.C.A.N. (89 Stat.) 773, 789, the predecessor to IDEA. *See Michael C. v. Radnor*, *Township School Dist.*, 202 F.3d 642, 652 n. 9 (3rd. Cir. 2000).

intervention services" as "developmental services" that "are designed to meet the developmental needs of an infant or toddler with a disability." This involves the chid's physical, cognitive, communication, social or emotional, and/or adaptive development. *Id*.

Congress realized that it was important to allow for an overlap of services rather than legislate a rigid and artificial demarcation inconsistent with the reality of early development because "[e]arly intervention research indicated that certain types of services required by infants and toddlers with disabilities are comparable to . . . services required by preschoolers with disabilities that are included in their individualized family service plans." H.R. Rep. at 7.

In enacting the amendments to the IDEA, Congress stressed that the transition from Part C to Part B upon a child's third birthday was to be "a *smooth transition*." *See* 20 U.S.C. § 1412(a)(9). Congress mandated that "[c]hildren participating in early-intervention programs . . . under [Part C], and who will participate in preschool programs [under Part B], experience a smooth and effective transition to those preschool programs in a manner consistent with section 1437(a)(8) of this title. By the third birthday, . . . an individualized education program or, if consistent with sections 1414(d)(2)(B) and 1436(d) . . . an individualized family service plan, has been developed and implemented. . .. The referenced section 1437(a)(8), sets forth certain requirements that states applying for funds under the Act must include in their application. Congress required that such states include a "description of the policies and procedures [] to ensure a smooth transition. Similarly, the referenced section 1414(d)(2)(B) specifically states that "an individualized family service plan . . . may serve as the IEP" when appropriate.

Moreover, Congress has clearly recognized that realities dictate that there must often be significant overlap in services

11

provided under Part C and Part B. Thus, Part C funds can be used from the child's third birthday to the beginning of the following school year. 20 U.S.C. § 1438(3). Conversely, a state can use Part B funds to provide services to a child who is not yet eligible for preschool early intervention services and therefore would not ordinarily qualify for funding under Part B. In addition, federal regulations explain that states shall comply with the requirement of providing a free, appropriate pubic education ("FRAPE") by ensuring that an IEP *or* an IFSP is in effect for the child beginning at age three. 34 C.F.R. § 300.121(c)(1)(ii). Therefore, we think it is clear that an IFSP under Part C can serve as a child's Preschool IEP under the Part B if the agency and the parents both agree. 20 U.S.C. §§ 1414(d)(2)(A) and (B), 34 C.F.R. § 300.342(c)(1).

Thus, in Pennsylvania, the Early Intervention Services System Act ("Act 212") mandates appropriate special education programs for disabled children from birth to age five. 11 Pa. Cons. Stat. Ann. § § 875-101 et. seq. (Purdon 2002). Under that act, the Pennsylvania Department of Education is responsible for providing services to disabled preschool children aged 3 to 5 as well as school aged children. The Department of Public Welfare is responsible for providing services to children from birth to age three.

The instant dispute over Georgia's conductive education is rooted in this administrative demarcation. The Department of Public Welfare   recognizes   conductive   education.   The Pennsylvania Department of  Education does not recognize it.

## B.  The Application of the Stay-Put Rule  to Georgia's Transition.

The Pardinis claim that the congressional concern for a smooth transition to preschool and services under Part B of the IDEA can best be accomplished through a program that includes

conductive education.  Moreover, since Georgia had been receiving conductive education as part of her IFSP, they claim that it was part of the "current educational placement." However, the AIU argues that Georgia's IEP should not merely mirror the services she was receiving under her IFSP because the IDEA recognizes a developmental, and educational change in focus when a child becomes three and begins preparing for school. The AIU states: "Stay-put does not apply to the initiation of services from Part C to Part B of the IDEA.  The programs operate under different agencies, different eligibility requirements, and different purposes. To argue that they are the same is preposterous." Appellee's Br. at 10.

Of course, the issue here is not whether Part C and Part B are the same; they clearly are not.  Rather, the issue is whether § 1415(j) required the AIU to include conductive education as part of Georgia's initial IEP until the agency and the parents could resolve their dispute over her IEP.   That is a very different question.

In resolving that inquiry against the Pardinis, the District Court relied largely on *Johnson v. Special Education Hearing Office,* 287 F.3d 1176 (9th Cir. 2002). There, parents sought an administrative hearing to challenge an IEP that provided for a change in the vendor that had offered a particular service under their son's IEP. The services that were contemplated by the education agency were identical to those that had been offered under their son's IFSP before his third birthday.  The agency claimed that the vendor could not continue to provide services after a child's third birthday, but the agency proposed offering the same services with a different vendor.

In the due process hearings that followed, the Hearing Officer ordered continuation of the placement and services, but concluded the school district "'need not utilize the same vendors who provided services under that IFSP.'" *Id.,* at 1179.

13

The parents responded by seeking an injunctive order in the District Court requiring the Hearing Officer to "issue a new 'stay put' order [forcing the school district] to use the same tutors, vendors, and supervisory services [as those in their son's IFSP]." *Id.* The District Court analyzed the dispute using the customary criteria for resolving claims for injunctive relief. That included an analysis of irreparable harm, and the likelihood of success on the merits. *Id*. Based upon that analysis, the court denied the request for injunctive relief, and the Court of Appeals affirmed citing *Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 625 (6th Cir. 1990).

Here, the District Court concluded that since "Plaintiffs are in the transition process applying for initial services under Part B[]," [t]he applicable stay-put placement for a three-year old child is the proposed public school placement and program." *Pardini*, 280 F. Supp. 2d at 455. Quoting from *Johnson*, the District Court also held, "[w]hen responsibility transfers from one public agency to another, 'the new agency is required only to provide a program that is in conformity with the placement in the last agreed upon IEP or IFSP. The new agency need not . . . provide the exact same educational program..'" (internal citation omitted).

We do not disagree with the reasoning in *Johnson.* However, we believe the District Court misapplied that decision. The parties in *Johnson* stipulated that the child's IFSP constituted "his current educational placement for 'stay put' purposes." 287 F.3d. at 1180, The parties were only disputing whether the identical services had to be provided by the same vendor who had provided them under the IFSP. Thus, to the extent that it applies to our analysis at all, *Johnson* undermines the District Court's focus on the distinction between the developmental needs of children who are less than three, and the educational needs of children who are older than three. The services offered under the IEP in *Johnson* were identical to those that had been offered under the IFSP.

14

The District Court cited *Johnson* in stating: "[w]hen responsibility transfers from one public agency to another, . . . 'the new agency need not, and probably could not, provide the exact same educational program.'" 280 F. Supp. 3d at 456. (quoting *Johnson*, 287 F.3d at 1181). However, since *Johnson* did not involve the child's entitlement to disputed services during the pendency of a dispute, the case is distinguishable from the circumstances before us. It is important to remember that Congress was concerned with the services and programs offered to handicapped children, not with the vendors supplying them. The District Court's failure to recognize that distinction undermines its reliance on *Thompson*.

Moreover, the District Court's error was compounded (or perhaps facilitated) by its reliance upon an analysis more appropriately utilized for ruling upon preliminary injunctions than enforcing the Act's stay-put rule. The court reasoned "that Plaintiffs would not be irreparably harmed by refusal to grant the injunction, and that the public interest would be served by permitting the . . . proceedings to continue, which would develop a full and meaningful record if further review became necessary." 289 F. Supp. 2d at 452. However, Congress has already balanced the competing harms as well as the competing equities. In *Drinker v. Colonial School Dist.*, 78 F.3d. 859, 864 (3d Cir. 1996), we explained that the Act "substitutes an absolute rule in favor of the status quo for the court's discretionary consideration of the factors of irreparable harm and either a likelihood of success on the merits or a . . . balance of hardships."

Although, as we have noted, the court in *Johnson* also engaged in a traditional preliminary injunction analysis, that analysis did not involve the stay-put rule. Rather, the Hearing Officer in *Johnson* had already entered a "stay-put order" under the Act and the parents were asking a court to enjoin *that order*, not the proposed IEP. The court explained: "Here, the Hearing Officer's 'stay-put' order preserves the tutors, goals, and plan .

15

. . it only changes the plan supervisors. . . . Thus, the 'stay put' order correctly determined [the child's] 'then current educational placement' and [the plaintiffs have] very little likelihood of success in challenging the 'stay put' order." 287 F.3d at 1182 (internal quotes in original). Moreover, "because the [agency] offered comparable placement [to the child] no irreparable harm would befall [him] by denying the preliminary injunction." *Id*. Here, of course, there is no "stay-put order" in place and the Pardinis are arguing that the program the AIU is proposing is not comparable to the program Georgia had been receiving under the IFSP. Therefore, *Johnson* does not support the District Court's holding. Moreover, we cannot reconcile the District Court's analysis with our decision in *Drinker*, *supra,* or our the Supreme Court's decision in *Honig v. Doe*, 484 U.S. 305 (1988).

In *Honig*, the Supreme Court rejected school authorities' claim that, under the circumstances there, proposed changes to a child's educational placement must remain in effect until the propriety of the placement was ultimately determined. The Court observed, "[t]he language of § 1415(e)(3)[9] is unequivocal. It states plainly that during the pendency of any proceedings under the Act, unless the state or local educational agency and the parents agree . . . , 'the child *shall* remain in the then current educational placement." *Id*., at 323 (emphasis in original). The facts in *Honig* dramatically underscore the impact and importance of the Court's ruling.

*Honig* involved two students whose individual cases were consolidated. Both students had engaged in disability-related misconduct. One student had forcefully choked a classmate and then kicked out a school window while being escorted to the principal's office. *Id.,* at 313. In both cases, the parents filed

---

[9] 20 U.S.C. § 1415(e)(3) is the forerunner to 20 U.S.C. § 1415(f), and the two provisions are identical.

16

suit under the predecessor of the IDEA in an effort to enjoin the school district from expelling their children until appropriate placements and IEPs were agreed upon. Except for the district's authority to impose a very brief suspension, the District Court enjoined the school district from unilaterally acting against "any disabled child for disability-related misconduct, or from effecting any other change in the educational placement . . . without parental consent pending completion of [due process] proceedings." *Id.*, at 315. The Court of Appeals affirmed but modified the District Court's order to allow for fixed suspensions of up to 30 school days. The court reasoned that the school district retained the authority to take such limited action under the stay-put rule and certain provisions of the state's Education Code.

On appeal, the school district asked the Supreme Court to read a "'dangerousness' exception into the stay-put provision[.]" The Court refused. The Court did not accept the school's argument that Congress obviously intended for schools to retain "residual authority to . . . exclude dangerous students from the classroom[.]" *Id*, at 323. The Court did not think it obvious that Congress intended schools or educational agencies to have any such power. Rather, the Court thought it "clear[] . . . that Congress very much intended to strip schools of the *unilateral* authority they had traditionally employed to exclude disabled students, . . . from school." *Id.*, at 323 (emphasis in

original).[10]  The Court thus concluded that the stay-put provision "means what it says." *Id.*, at 324.

Nor are we convinced by AIU's claim that, since this was Georgia's initial IEP, it constituted the "current educational placement" for purposes of the stay-put rule.  In *Drinker,* we stressed the importance of maintaining the *status quo* when identifying "the then current educational placement" for purposes of the stay-put rule. 78 F.3d at 864.  We stated:

> [I]mplicit in the maintenance of the status quo is the requirement that a school district continue to finance an educational placement made by the agency and consented to by the parent before the

---

[10] Given this clear statutory authority, the District Court's belief in the primacy of the  educational agency is somewhat puzzling.  The court stated:  "[t]he responsibility for choosing the educational method most suitable to the child's needs is left to the educational agency." 280 F. Supp. 2d at 454.  To the extent that this suggests a marginalized or diminished role for the parents, the court's assessment of the respective roles is erroneous.  It is clear that the parents are not to be excluded from the decision, and the "responsibility" for the decision does not solely rest with the educators or an educational agency.  Rather, "Congress repeatedly emphasized throughout the Act *the importance and indeed the necessity* of parental participation in both the development of the IEP and any subsequent assessments of its effectiveness." *Honig,* 484 U.S. at 598 (emphasis added).  Although the Court was there referring to an IEP, parental involvement in an IFSP is no less important under the Act. "[T]he Act establishes various . . . safeguards that guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think inappropriate." *Id.*, 312-3.

> . . . due process [procedure is invoked]. To cut off public funds would amount to a unilateral change in placement, prohibited by the Act.

*Id*. (brackets in original) (quoting *Zvi D. v Ambach*, 694 F.2d 904, 906 (.2d. Cir. 1982).

We are also not persuaded by AIU's claim that the demarcation between Part C and Part B of the IDEA, and the administrative and fiscal division of the providers of services offered under those respective programs, counsels against viewing the IFSP as the "current educational placement" under the circumstances of this dispute. This distinction simply can not negate the explicit language of the stay-put provision, Congress's concern for the child's "smooth transition," the Supreme Court's analysis in *Honig* or our decision in *Drinker*. Rather, we think it clear that "[t]he [stay-put] provision represents Congress' policy choice that all handicapped children, regardless of whether their case is meritorious or not, are to remain in their current educational placement until the dispute with regard to their placement is ultimately resolved." *Drinker*, at 865.

Our conclusion is not altered by the fact that Part C programs are deemed "developmental" and part B programs are deemed "educational." As we explained in *Drinker*:

> Because the [current educational placement] connotes preservation of the status quo, it refers to the operative placement actually functioning at the time the dispute first arises. If an IEP has been implemented, then that program's placement will be the one subject to the stay put provision. And where ... the dispute arises before any IEP has been implemented, the current educational placement will be the operative placement under

19

> which the child is actually receiving instruction at the time the dispute arises.

*Drinker*, at 867 (quoting *Thomas v. Cincinnati Bd. of Educ.,* 918 F.2d 618, 625-26 (6th Cir.1990)) (internal quotation marks omitted). Here, it is beyond dispute that Georgia was receiving an IFSP that included conductive education when the dispute arose. That was the "operative placement actually functioning [when this dispute arose." Georgia was therefore entitled to continue to receive that service as a component of her IEP until the dispute was resolved following her third birthday.

> Had Congress intended a prospective IEP to govern the Act's stay put provision, as opposed to an operational placement, it could have employed the term "individualized educational program" which it had already defined. Since it did not, the term "then current educational placement" must be accorded, its plain meaning. Because the term connotes preservation of the status quo, it refers to the operative placement actually functioning at the time the dispute first arises. . . .where, as here, the dispute arises before any IEP has been implemented, the "current educational placement" will be the operative placement under which the child is actually receiving instruction at the time the dispute arises

*Thomas* 918 F.2d at 625-26.

In addition, 20 U.S.C. §1415(j) must be read in context with the rest of the IDEA statute. It is a fundamental rule of statutory construction that a statute's provisions should be read to be consistent with one another. *United Steelworkers of America v. North Star*, 5 F.3d. 39, 43 (3d Cir., 1993). Instead of noting the differences between the Part B and Part C programs, we must remember that Congress sought to ensure continuity in

the education of each under the IDEA. Yet, the AIU's attempt to chisel distinct barriers between services provided under Parts C and B based upon its theory of childhood development would require us to ignore the programmatic and fiscal overlap between Part C and Part B as well as the congressional mandate of a smooth transition between the two. Congress stressed that the amendments it added were "designed to promote a *seamless* system of services for children with disabilities, aged birth to five, inclusive." H.R. Rep. No. 198, 102nd Cong., 1st Sess. 1991, WL 185659, at 7.

Congress has clearly recognized that needs of disabled children do not fit neatly into the age-defined stages suggested by the AIU. Although Georgia was technically transitioning within the administrative and fiscal structure of IDEA's statutory scheme, her needs did not magically change on her third birthday. She still needed substantially the same services she was receiving in the days preceding her birthday. Indeed, 20 U.S.C. § 1412(a)(9) describes the transition to the preschool programs and notes that either an IEP or an IFSP may be used and implemented for the child. The Act expressly states that an IFSP may be used if it is "consistent with State policy," and "agreed to by the agency and the child's parents." Thus, the IDEA both anticipates and condones the possible interchangeability of an IFSP and IEP during transition to preschool.

Furthermore, even if we could accept the AIU's theory of "development" vs. "education," we would still be convinced that by the analysis in the cases we have discussed, that the conductive education in Georgia's IFSP was part of the status quo that should have been maintained pending resolution of the dispute over her IEP.

21

The District Court also relied upon on OSEP's *Letter to Klebanoff.* "[T]he level of deference to be accorded such interpretive rules depends upon their persuasiveness." *Michael C. V. The Radnor Township School Dist.,* 202 F.3d 642, 649. In evaluating persuasiveness we consider such factors as the thoroughness, reasoning, and consistency with other agency pronouncements. *Chester County Intermediate Unit v. Pennsylvania Blue Shield*, 896 F.2d 808, 815 (3d. Cir. 19900).

In *Letter to Klebanoff*, the OSEP answered an inquiry regarding whether the stay-put provision mandated the continuation of services a three-year old received in the Birth to Three-Year old program when the parents did not agree to the school's proposed education program. OSEP responded to the inquiry by stating it did not interpret 34 C.F.R. § 300.513 as requiring a public agency responsible for providing FAPE . . . to maintain [the] child in a program developed for a two-year old child as a means of providing that child and . . . [h]er family appropriate early intervention services under Part H." 28 IDELR 478.[12] However, the OSEP never explained how it reached that

---

[11] "OSEP" refers to the Office of Special Education Programs of the U.S. Department of Education.

[12] "Part H of the IDEA requires states to provide 'appropriate early intervention services to all infants and toddlers with disabilities and their families.' The statute defines 'infants and toddlers with disabilities' as 'individuals from birth to age 2, inclusive. Similarly, states must provide 'a free appropriate public education' to disabled individuals between the ages of three and twenty-one years old to be eligible to receive federal funds under part B of the IDEA." *Still v. DeBuono*, 101 F.3d 888, 891 (2d. Cir. 1996) (citations omitted). Although Part H and Part B "are distinct in notable respects, their basic structure

conclusion. Moreover, we find the discussion in *Thomas v. Cincinnati Bd. of Ed*. much more helpful. We agree that the plain meaning of "current educational placement" refers to the "operative placement actually functioning at the time the dispute first arises." 918 F.2d 618 at 625-626 (6th Cir. 1990).

In *Thomas*, an IEP was developed for a severely retarded eleven year old child, but before the services were to begin, doubts about funding caused the school to review the plan. The Court of Appeals held that the IEP could not be the "current educational placement" because it had never been implemented. Likewise, here, the proposed IEP had not been implemented when the dispute over whether it should contain conductive education arose. Rather, Georgia's operative placement consisted of the services she was receiving under her IFSP.

### III. Conclusion

For the reasons set forth above, we hold that the stay-put provision of the IDEA, 20 U.S.C. § 1415(j), required Georgia to continue to receive conductive education until the dispute over its appropriateness for inclusion in her IEP was resolved. Accordingly, the Pardinis are entitled to the cost of the conductive education that they purchased before the dispute was resolved by their agreement to an IEP that did not contain it. We will therefore reverse the decision of the District Court and remand for the court to determine the amount of reimbursement the Pardinis are entitled to as well as the amount of any attorneys fees.[13]

---

and purpose are strikingly similar . . . ." *id*., at 892, Part B establishes an IEP, and part H establishes an IFSP. .

[13] The District Court reached the merits of the Pardinis' complaint without requiring exhaustion of administrative remedies under the IDEA because of the "bewildering

23

bureaucratic nightmare," they had faced in dealing with the AIU. 280 F. Supp. 2d at 454. We assume that the court was concluding that exhaustion would be futile and that failure to exhaust was therefore excused. *See W.B. v. Matula*, 67 F.3d 484, 495-96 (3d.Cir. 1995). On appeal, the AIU argues that the reimbursement remedy the Pardinis are seeking "is an available administrative remedy in an administrative proceeding," and urges us to deny relief because an administrative remedy is available. Appellee's Br. at 16.

However, the issue here - the interpretation of § 1415(j) - is a purely legal one. "Courts require exhaustion where the peculiar expertise of an administrative hearing officer is necessary to develop a factual record. . . . Where the factual record is fully-developed and no evidentiary disputes remain, the court can and should decide legal issues. *Octavia P. v. Gilhool*, 916 F.2d 865, 869 (3d. Cir. 1990) (citations omitted).

24