BARKETT, Circuit Judge,
dissenting:
I would agree with the majority’s application of the “stay put” provision’s plain language — that the pendency placement for a child applying for initial admission to public school is only the public school — if this case involved a situation for which that part of the provision was intended; that is, for a school-aged, disabled child who had never received services under the IDEA and was applying for initial admission to public school. The triplets in this case, however, were receiving services under later amendments to the IDEA, which were designed to promote the development of children before they reach school age and assure their smooth transition into school when they reach school age. Thus I believe the majority errs by finding as a matter of law that the receipt of these services did not entitle the triplets to the continuation of services pending resolution of their placement dispute.
Although we are generally to apply a statutory provision’s plain language, we must read that language in context,[1] and consider the statute’s overarching purpose in order to avoid absurd results.[2] Congress enacted “stay put” provisions under both Part C and Part B of the IDEA— each of which, when read independently, prohibit the disruption of services during a placement dispute. Moreover, Congress made clear its intent that there be a smooth transition from one part of the statute to the other. Thus, it would be absurd to apply the “stay put” provision in a manner that reaches the completely opposite result: the withdrawal of existing services to a disabled child when she reaches school age.[3] Withdrawing neces *733 sary services at the moment of transition eviscerates the procedural protections Congress afforded parents who challenge a proposed change in services, disrupts the smooth transition Congress expressly intended for children transitioning from one program to the other, and punishes children whose disabilities have been detected and addressed early under the statute, leaving them with no accommodation pending resolution of a placement dispute. The IDEA cannot reasonably be read to permit this result. Therefore, I respectfully dissent.
The “stay put” provision at issue was enacted in 1975, at a time when the IDEA’S predecessor statute provided funding for special education and related services only to school-age children and did not provide for early intervention services to infants and toddlers. See Education for All Handicapped Children Act of 1975, S. 6, 94th Cong., 89 Stat. 773 (1975) (“EAH-CA” or “the Act”).[4] Because the statute did not yet provide for early intervention services to disabled infants and toddlers, its provisions were drafted with only school-age children in mind.[5] The “stay put” provision assured that, pending the resolution of a placement dispute, a school-age child applying for initial admission to public school would be guaranteed placement in the public school program (rather than be excluded on the basis of disability),[6] and that a child already in school with an educational placement under the IDEA would be entitled to maintain that placement until the dispute was resolved.[7] The dual purposes of this procedural safeguard were clear: to guarantee access to public school, on the one hand, and to maintain special educational services where those were already being provided, on the other. The drafters of this provision could not have intended, or even anticipated, that once Congress amended the statute to also provide grants for early intervention services to disabled infants and toddlers, this “stay put” provision would be construed against the interests of a disabled child to result in the withdrawal of services pending the resolution of a placement dispute.
More than a decade later, in 1986, Congress enacted what we now know as Part C of the IDEA to address the developmental disabilities of handicapped infants and *734 toddlers before those children reached school age (ages birth to 2, inclusive).[8] See Education of the Handicapped Act Amendments of 1986, S. 2294, 99th Cong., 100 Stat. 1145 § 101(a) (1986) (“1986 Amendments”). In passing this legislation, Congress recognized that certain special education needs could be mitigated if children’s developmental disabilities were addressed before they reached the age of 3. Congress thus developed a program to help states identify handicapped infants and toddlers and provide “early intervention services” to those children and their families. Id. at §§ 676, 677. Entities receiving federal funding for this purpose were to develop “individualized family service plans” (“IFSPs”) that would identify each child’s developmental needs and the particular services required to meet those needs. Id. at § 677(d).
Notably, as it had done more than ten years before with Part B, Congress enacted a “stay put” provision for parents who disputed a proposed change in services now provided to handicapped infants and toddlers, to assure that those services too would be maintained during any dispute.[9] Id. at § 680(7). Congress additionally required that IFSPs state “the steps to be taken supporting the transition of the handicapped toddler to [special education] services provided [to school age children] under part B” where those services would be needed, id. at § 677(d)(7) (emphasis in original), thereby emphasizing the importance of a smooth transition from this new program into Part B.
As of 1986, then, it was clear that Congress intended to develop a framework for the continuous provision of services to handicapped children from birth through school age in order to promote their educational development. The 1986 amendments dovetailed with the existing law (providing for services for children ages 3 and up) by providing for early intervention services for children from birth to age 2, inclusive, and increasing the incentives to provide services for children ages 3 to 5.[10] The “stay put” provision pertaining to handicapped infants and toddlers guaranteed that parents could maintain the current level of early intervention services pending resolution of any dispute. Congress therefore intended that where services were provided under the IDEA (whether under Part B or Part C of the IDEA), those services would continue to be provided if a dispute arose as to a child’s proper placement, until the dispute was resolved.
Indeed, Congress recognized that where early intervention and special education services would be provided by different *735 entities, it would be “essential that the agencies coordinate their efforts to transition the child to the special education system operated by the local educational agency.” H.R. No. 99-860, at 6, as reprinted in 1986 U.S.C.C.A.N. at 2407. The House Report also noted that speedy resolution of placement disputes in the infant and toddler program would be essential “because an infant’s development is rapid and therefore undue delay could be potentially harmful.” Id. at 14, as reprinted in 1986 U.S.C.C.A.N. at 2415.
Congress’ intention to ensure a smooth transition from Part C to Part B became most prominent in the IDEA’S 1991 amendments. See Individuals with Disabilities Education Act Amendments of 1991, S. 1106, 102nd Cong., 105 Stat. 587 (1991) (“1991 Amendments”). Congress expressly crafted those amendments “to facilitate the development of a comprehensive ‘seamless’ system of services for children, aged birth to 5, inclusive, and their families which will ensure ... a smooth transition for children moving from early intervention programs under [Part C] to preschool programs under part B .... ” H.R. No. 102-198, at 4 (1991), as reprinted in 1991 U.S.C.C.A.N. 310, 313 (emphasis added). The House Report found that “it is critical that there will be no gap in services when a child turns three ...” Id. at 7, as reprinted in 1991 U.S.C.C.A.N. at 316.
To this end, the 1991 amendments (1) require that state educational agencies establish policies and procedures for the smooth transition from early intervention services to special education services in preschool programs, including an assurance that either an IEP or an IFSP is being implemented by the disabled child’s third birthday; (2) allow educational agencies, with the parents’ consent, to continue using IFSPs as IEPs for children ages 3 to 5; (3) authorize states and local educational agencies to use preschool grants to provide a FAPE to 2-year old children with disabilities who will turn 3 during the school year; (4) require that personnel be trained to coordinate transition services for children moving from early intervention services to special education services in preschool programs; (5) make transition arrangements available that involve the family; and (6) guarantee the right of parents or guardians to determine whether a disabled infant or toddler will accept or decline an early intervention service without jeopardizing other early intervention services. See 1991 Amendments §§ 5; 7; 13; 15; 16; and 17.
In short, these amendments were unambiguously designed to assure continuous services to disabled children from birth through school age notwithstanding any disputes and disagreements as to a child’s placement. The majority errs by reading the “stay put” provision entirely outside this context and, having done so, reaches a result that is contrary to the history, design, and purpose of the IDEA. In order avoid an absurd result and give effect to the IDEA’S procedural safeguards, we cannot read the “stay put” provision in isolation.
Nowhere could the absurd consequences of our failure to consider statutory language in context be clearer than under the facts presented in this case. The majority’s interpretation of “stay put” allows for the actual withdrawal of services to the triplets in the middle of a school year (when they turned 3 years old), even though the School Board failed to meet its statutory obligation to have an IEP in place for the triplets when they reached the age of 3.[11] This ruling thus has the *736 surely unintended effect of allowing a school board to abdicate its obligation to develop IEPs for disabled infants and toddlers about to transition, and leaving those children and their parents with no effective recourse during the pendency of a placement dispute.[12] A procedural safeguard intended to protect the rights of disabled children during a placement dispute simply cannot reasonably be read to result in the withdrawal of services already identified as necessary to a child’s educational development. This result is contrary to the purpose of the IDEA.
Relying solely on part of the “plain language” of the stay-put provision to conclude that the only placement for a disabled child who has reached school age and is therefore applying for initial admission to public school is a “public school program” with no accommodation, the majority rejects the argument that the existing IFSP may constitute the triplets’ then-current educational placement, so as to entitle them to continuation of those services pending the resolution of their dispute with the School Board. For the foregoing reasons, concluding as a matter of law that existing IFSPs cannot constitute a current educational placement is inconsistent with the statute, when read as a whole, as well as with its intent and purpose. This conclusion is also inconsistent with our reasoning in M.M. ex rel. C.M. v. Sch. Bd. of Miami-Dade County, Fla., 437 F.3d 1085 (11th Cir.2006). In M.M., we recognized that “early intervention services” previously provided under Part C— the same type of services the triplets had been receiving here — may also constitute “special education and related services” for purposes of establishing eligibility for reimbursement for private school expenses when a child is denied a FAPE.[13] If “early intervention services” may constitute “special education services” for purposes of establishing eligibility for reimbursement under the IDEA, then they may also constitute a child’s existing “educational placement” for purposes of “stay put.”[14] *737 Like the triplets here, C.M. (the child of M.M.) had never been enrolled in public school (by virtue of not having yet reached school age), but had been provided early intervention services under the IDEA. Even though C.M. had never been enrolled in public school, we held that her parents were eligible for reimbursement for private school expenses because the early intervention services C.M. had previously received constituted “special education and related services under the authority of a public agency’’ for purposes of the reimbursement provision. M.M., 437 F.3d at 1098. The majority errs by finding as a matter of law that the triplets did not have a current educational placement without considering, consistent with our case law, whether the “early intervention services” they received also constituted “special education and related services.”
In Pardini v. Allegheny Intermediate Unit, 420 F.3d 181 (3d Cir.2005), the Third Circuit found that Part B’s “stay put” provision required the continuation of early intervention services to a child transitioning from Part C to Part B pending resolution of a placement dispute, because those services constituted the child’s “educational placement,” even though the child had not previously been admitted to public school. In reaching that conclusion, the Third Circuit took particular note of Congress’ intention that children transitioning from Part C to Part B enjoy a smooth transition.[15] See id. at 191 (“Congress stressed that the amendments it added [to the IDEA] were ‘designed to promote a seamless system of services for children with disabilities, aged birth to five, inclusive.’ ”) (citation omitted). Although the majority rejects our sister Circuit’s decision in Pardini as “incorrectly decided,” it fails to address how its ruling squares with our own reasoning in MM.
For these reasons, I dissent.

. See In re International Admin. Serv., Inc., 408 F.3d 689, 708 n. 7 (11th Cir.2005) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme .... We must therefore interpret the statute as a symmetrical and coherent regulatory scheme ... and fit, if possible, all parts into an harmonious whole.”) (citations and internal quotation marks omitted); United States v. Ballinger, 395 F.3d 1218, 1237 (11th Cir.2005) ("[Statutory language must be read in the context of the purpose it was intended to serve.”).

. See Broward Gardens Tenants Ass'n v. U.S. E.P.A., 311 F.3d 1066, 1075-76 (11th Cir.2002) (plain meaning of statutory language does not control if it would lead to truly absurd results). Although the majority takes issue with the use of the word "absurd” in this opinion, any reference to "absurd result” herein is merely a statement and application of the relevant legal standard for purposes of statutory interpretation.

.In this case, the School Board refused to continue, or pay for the continuation of, the "early intervention services” the triplets had been receiving when they turned 3 on January 4, 2004; that is, right in the middle of the school year.
Although the majority is correct that in this case the School Board ultimately offered the triplets placement at a private school for children with autism (in the form of a proposed "temporary” IEP about a month after refusing to continue early intervention services), no such placement is mandated by the majority's reading of "stay put.” The only placement required under the majority’s opinion is enrollment in the public schools. Moreover, there is no indication that the private school placement the School Board belatedly offered the triplets in this case would have included the particular one-on-one services which they had been receiving. Thus, this accommodation would not have been the same as continuing those services already deemed to be necessary and appropriate for these children. *733 It is precisely the continuation of services pending a placement dispute that Congress sought to protect by enacting “stay put.”

. In 1990, Congress changed the name of the law to the "Individuals with Disabilities Education Act.” See Education of the Handicapped Act Amendments of 1990, S. 1824, 101st Cong. § 901(a), 104 Stat. 1103, 1141 (1990).

. Specifically, the Act was designed to assure that a free and appropriate public education ("FAPE”) was made available to handicapped children ages 6 and above, and provided incentives for States also to offer a FAPE to preschoolers between the ages of 3 and 5. EAHCA § 612(2)(B).

. Indeed, Congress passed the legislation after finding that a million handicapped children in the United States were "excluded era-tirely from the public school system ...” See EAHCA § 3(b)(4) (emphasis added); see also Honig v. Doe, 484 U.S. 305, 323, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988) (finding that by enacting the "stay put” provision, "Congress very much meant to strip schools of the unilateral authority they had traditionally employed to exclude disabled students ... from school.”).

.The “stay put” provision under Part B provides that, unless the school and parents otherwise agree,
the child shall remain in [his or her] then-current educational placement ... or, if applying for initial admission to a public school, shall, with the consent of the parents, be placed in the public school program until all such proceedings have been completed.
20 U.S.C. § 1415(j).

. What is now Part C of the IDEA was originally designated as “Part H.” For clarity, however, I refer to that section of the statute as "Part C” throughout.

. The “stay put” provision relevant to the infants and toddlers program provides:
During the pendency of any proceeding or action involving a complaint by the parents of an infant or toddler with a disability, unless the State agency and the parents otherwise agree, the infant or toddler shall continue to receive the appropriate early intervention services currently being provided or, if applying for initial services, shall receive the services not in dispute.
20 U.S.C. § 1439(b)(2005).

.The requirement that attention be paid to the transition of handicapped infants and toddlers who would continue to require services when they reached school age protected against any interruption in services necessary for the child’s development and education. Early intervention services were to include case management services designed to facilitate “the development of a transition plan to preschool services” where those would be needed. H.R. No. 99-860, at 8, as reprinted in 1986 U.S.C.C.A.N. 2401, 2408.

. While the School Board may dispute the parents’ allegations in this case, the posture *736 of this appeal (as an appeal from the district court’s grant of the School Board's motions to dismiss) requires us to accept those allegations as true.

.The majority contends that the reimbursement remedy is sufficient, because aggrieved parents can simply pay for private educational services on their own during the pendency of the placement dispute, and then sue to recover those expenses if it is later determined that the school denied the child a FAPE. While the Supreme Court has noted that “conscientious parents who have adequate means and who are reasonably confident of their assessment” will often choose that course, School Committee of Town of Burlington, Mass. v. Dep't of Educ. of Mass., 471 U.S. 359, 370, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985), this is no remedy for parents who do not have the financial means to pay for private educational services in the first place. The IDEA’S procedural safeguards promote access to a free and appropriate public education by protecting disabled children’s current educational placements during a dispute as well as by providing for reimbursement when children are denied a FAPE under Part B and then seek private services on their own.

. Section 1412(a)(10)(C)(ii) provides:
If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary school or secondaiy school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.
20 U.S.C. § 1412(a)(10)(C)(ii) (emphasis added).

. To the extent that a particular IFSP does not contain an educational component, as defined under the IDEA, a school board would not be required to continue those services *737 under this construction of "stay put.” All the IDEA requires is that schools make a FAPE accessible to children with disabilities through the provision of "special education and related services.”

. The Third Circuit also rejected the interpretation of "stay put” by the Department of Education, finding it to be unpersuasive in light of the purpose and design of the statute. Pardini, 420 F.3d at 191. Indeed, an agency interpretation is not entitled to deference when it is not based on a permissible construction of the statute. See Chevron v. Natural Res. Def. Council, 467 U.S. 837, 842-44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).