[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 04-14982
_____

D.C. Docket No. 03-21918-CV-FAM

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
January 25, 2006
THOMAS K. KAHN
CLERK

M.M., on behalf of their
minor child, C.M.,
B.M., on behalf of their
minor child, C.M.,

Plaintiffs-Appellants,

versus

SCHOOL BOARD OF MIAMI-DADE
COUNTY, FLORIDA, a political
subdivision of the State of Florida,

Defendant-Appellee.

_____

Appeal from the United States District Court for the
Southern District of Florida
_____

**(January 25, 2006)**


Before HULL, MARCUS and HILL, Circuit Judges.

PER CURIAM:

C.M.'s parents appeal the district court's dismissal of their complaint filed pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 et seq. After review and oral argument, we affirm the district court's dismissal but remand for the limited purpose of allowing the district court to modify its order of dismissal.

## I. BACKGROUND

### A.     C.M.'s Disability

C.M. was born on November 24, 1998, with profound bilateral sensorial hearing loss. The diagnosing audiologist asked C.M.'s parents whether they wanted C.M. to learn to communicate orally (through spoken language) or manually (using sign language). C.M.'s parents indicated that they wanted C.M. to be an oral communicator.

The audiologist recommended that C.M. be fitted with hearing aids and begin auditory-verbal therapy ("AVT").[1] After doing considerable research, C.M.'s parents determined that AVT was the best methodology for their child.

Accordingly, C.M.'s parents fitted C.M. with hearing aids and took her to see Kathy Bricker, an audiologist with the University of Miami Ear Institute, for an hour of AVT each week. C.M. was nine months old at the time.

After about six months, it was clear that C.M. was not getting enough sound from the hearing aids she was wearing, even though they were the most powerful on the market. After consulting with experts, C.M.'s parents decided that C.M. should receive a cochlear implant.[2]

---

[1] The following are the "nine basic principles" of AVT: (1) early detection and identification of the hearing impairments in infants and toddlers; (2) aggressive medical techniques and maintenance of appropriate hearing aids, cochlear implants, or other sensory aids; (3) appropriate technology to achieve maximum benefit of learning spoken language through listening; (4) favorable auditory learning environments for acquisition of spoken language, including one-to-one teaching; (5) affirmation of the parent as the primary model in helping the child learn to listen to his or her own voice, the voices of others, and the sounds of the environment; (6) integrating listening into the child's total personality so that listening becomes a way of life; (7) ongoing assessment, evaluation, and prognosis of the child developing auditory, language, speech, and cognitive skills; (8) full mainstreaming of the hearing-impaired child into the regular education system beginning at preschool so that the child will have mainstream peers as role models; and (9) active participation of the parents in order to improve spoken communication between the child and family members.

[2] Cochlear implants have both external and internal components. The external cochlear implant components include a microphone (through which sound enters), a speech processor (which is an individually programmed, computerized device that deciphers the sound and translates it into an electric signal), and a transmitting coil held in place by a magnet (which, by means of a radio wave, transmits the signal sent by the processor through the intact skin).

The speech processor must be programmed or mapped, by an audiologist on a regular

3

On April 4, 2000, Dr. Thomas Balkany, the head of the Health Services' Department of Otolaryngology at the University of Miami, successfully performed C.M.'s cochlear implant surgery. The device was "activated" three to four weeks after the surgery. The date of activation of a cochlear implant is considered "day one of hearing" for an implant recipient, who "has to learn all the pragmatics of hearing, just like a newborn has to learn them."

Cochlear, which sells the devices, recommends that children who are implanted with a cochlear device receive an "educational program that maximizes exposure to meaningful sounds . . . [particularly] exposure to spoken language every day." However, Cochlear does not recommend any particular program.

Although Cochlear does not recommend any particular program, Dr. Balkany does. According to Dr. Balkany, AVT "is the best form of therapy" for the implanted child. Consequently, C.M. continued to receive AVT for one hour each week.

In the summer of 2001, C.M.'s parents enrolled her in a half-day summer program at their local synagogue. C.M.'s parents then elected to enroll C.M. in

basis following the implantation, to adjust for changes in the implant recipient's listening skills and developmental progress. Without such regular programming, the recipient would not be able to continue to hear.

The internal cochlear implant components include a receiver/stimulator located directly under the skin beneath the transmitting coil and an array of electrodes implanted in the cochlea that emit electrical charges to stimulate the auditory nerve fibers.

the synagogue's year-round preschool program for children from six weeks to five years of age. Although the synagogue accepts disabled students like C.M., it does not provide them with special education classes, such as AVT.

Until C.M. turned three in November 2001, the AVT she received was paid for through the Miami-Dade County Early Intervention Program ("Early Intervention Program"). After age three, the Early Intervention Program no longer pays for AVT. In addition, until age of three, C.M. received oral motor therapy and other special education services under the authority of a public agency.

**B.      Efforts to Provide an Individual Education Plan**

In late 2001, the Miami-Dade School Board received written materials from the Early Intervention Program in order to determine whether C.M. was a candidate for receiving special education services from the Miami-Dade School Board. In mid-November 2001, School Board staff members and C.M.'s parents met to discuss C.M.'s eligibility for special education services.

At the outset of the meeting, C.M.'s parents inquired about AVT as C.M. was still receiving AVT one hour per week. The School Board stated that before any decisions were made, they would have to "go through" the Early Intervention Program materials. The evaluations were finished on November 30, 2001.

On January 10, 2002, the School Board and C.M.'s parents met again and the results of the evaluations were discussed. The School Board and C.M.'s parents agreed that C.M. was eligible for special education services.

C.M.'s parents indicated that they were satisfied with C.M.'s current private preschool placement at the synagogue and that they wanted C.M. to continue to receive AVT but have the School Board pay for it.[3] The School Board explained to C.M.'s parents that the Board did not provide AVT but that it did have other programs to recommend.

The School Board utilizes the verbotonal ("VT") approach, rather than AVT, to develop the oral communication skills of hearing-impaired students who communicate orally.[4] VT is a recognized and well-established means by which to teach hearing-impaired children to speak. VT has evolved since cochlear implants and has become a flexible methodology that can be adapted to meet the individual needs of an implanted child. Like AVT, VT focuses on sharpening listening skills and strengthening the auditory pathway. Visual and tactile clues, vibratory

---

[3]Tuition at the synagogue was free because C.M.'s mother teaches music there. The AVT sessions cost $100/hour.

[4]The Board began using VT in the early 1980s. Since that time, the Board has spent approximately $80,000 to train its personnel in using VT strategies and techniques. The Board does not have staff trained in AVT.

AVT and VT are both oral methods within the oral mode of communication (as opposed to manual methods such as sign language).

stimulation, and body movements are used, but only if needed. VT may be provided on either a group or individual basis. Unlike AVT, VT does not rely on parental participation for successful results.

As to C.M.'s academic classes, the Board advised C.M.'s parents at the January 2002 meeting that there was no age-appropriate, "mainstream" public school placement option available in Miami-Dade County that the School Board could offer. However, the Board did recommend placement in a "special education" class taught by Darci Lester at one of the public schools.

Specifically, Lester is a teacher for the deaf and hearing impaired who received VT training from the Board. Lester taught a self-contained class of three-, four-, and five-year-old, hearing-impaired children at Arcola Lakes Elementary School. There were seven students in her class, one of whom had a cochlear implant. Two of the older students had cognitive impairments. The three-year olds were "very high functioning." The children in the class were grouped according to their abilities.

The Board also offered C.M. a varying exceptionalities, reverse mainstream class (with 12 "mildly handicapped" students and two non-disabled students serving as models for the disabled children) at Highland Oaks Elementary School,

and a half-day, self-contained speech/language class, taught by a certified teacher for the deaf at Myrtle Grove Elementary School.

After the Board made its recommendations during the January 2002 meeting, C.M.'s parents informed the Board that they were not interested in any of them. C.M.'s parents repeated their desire for C.M. to remain in the synagogue preschool, but have the Board pay for C.M.'s AVT.

The School Board refused to pay for C.M.'s AVT. Instead, the School Board offered 90 minutes of "small teacher [sic] instruction and specialized instruction in expressive and receptive [language] skills" on a "walk-in" basis at Highland Oaks Elementary School. The Board's offer included VT techniques only. C.M.'s parents wanted only 60 minutes (not 90) so they would not have to pull C.M. out of the synagogue preschool three times a week.

The Board prepared an Individual Education Plan ("IEP") for C.M. for the period January 11, 2002, to January 9, 2003. According to the IEP, C.M. would receive 60 minutes of "small teacher [sic] instruction and specialized instruction in expressive and receptive [language] skills" from a "speech/language pathologist" on a "walk-in" basis at Highland Oaks Elementary School. The Board's offer included VT techniques, not AVT.

Although C.M.'s parents signed the January 2002 IEP, they wrote the following in the comment section: "Agree to walk-in but disagree w/ placement options. [C.M.] is in need of auditory-verbal services [AVT] to fully access her education. The School District says they are not able to provide this!! Why?"

After speaking with the speech/language pathologist who would be providing services to C.M., C.M.'s parents concluded that the Board's offer would be "wrong" for C.M. On January 31, 2002, C.M.'s parents filed a due process hearing request on behalf of C.M. challenging the School Board's refusal to provide C.M. with AVT.

On May 20, 2002, the School Board and C.M.'s parents entered into a mediation agreement, which provided:

> 1. Miami/Dade County guidelines for specific learning disabilities and OT [Occupational Therapy] criteria will be mailed to the parents as soon as possible.
>
> 2. An IEP meeting will be held to write appropriate goals and objectives to address OT, oral motor therapy, speech and language services, L.D. [learning disabilities] guidelines specific to [C.M.], auditory development goals, LRE [least restrictive environment] and cost of mapping. The meeting will be held within one month after parents contact Edna Waxman [of the School Board].
>
> 3. Dennis Hoffman [of the School Board] will provide to parents prior to IEP meeting documentation of progress made of students attending or [who] have attended Miami/Dade County Schools who received [VT] and had cochlear implants.

4. Edna Waxman will mail to parents prior to IEP meeting Miami/Dade Count[y's] guidelines for oral motor services.

5. Parents agree for [C.M.] to be evaluated by OT and Speech Lang[uage] pathologist speci[a]lizing in oral motor development.

The School Board sent an occupational therapist to C.M.'s school for observation. However, C.M.'s parents contacted Ms. Waxman and informed her that they did not want to have another IEP meeting and that they preferred to go ahead with the due process hearing. At the time the January 2002 IEP expired on January 9, 2003, C.M.'s due process hearing request was still pending.

## C.     Efforts to Develop A Successor IEP

On January 21, 2003, the School Board and C.M.'s parents (with their attorney and C.M.'s AVT instructor) met in order to develop a successor IEP. C.M.'s parents felt that the meeting was a waste of time because the School Board was not going to agree to AVT. Nevertheless, C.M.'s parents participated in developing a successor IEP.

A successor IEP was drafted to cover the period from January 21, 2003, to January 20, 2004. The successor IEP indicated that C.M. should be placed in a regular education pre-kindergarten class of four- and five-year olds at Greynolds Park Elementary School. The class used the "high Scope Curriculum," which is

10

"very language based" and promotes "constant communication in the classroom." C.M. was also to receive various supporting services including: (1) 60 minutes per week of specialized assistance from a teacher using VT techniques; (2) an extra 30 minutes per week of "expressive/receptive [language] skills" training; (3) 30 minutes per week of "oral motor skills" training; and (4) occupational therapy. The School Board representatives agreed that C.M.'s classroom should be "acoustically sound" and that C.M. should be given "preferential seating."

C.M.'s parents disagreed with the successor IEP because it provided for the use of VT techniques instead of AVT. Therefore, C.M.'s parents kept her in private school and in private AVT.

## D.     The State Administrative Hearing

The due process hearing before an Administrative Law Judge ("ALJ") , that C.M.'s parents requested on January 31, 2002, was held February 12 through 14, 2003, and March 11 through 12, 2003.[5] At the hearing, all the above information was introduced.

---

[5]The plaintiffs' due process hearing was conducted by an ALJ at the Florida Division of Administrative Hearings.

The ALJ issued a 111-page opinion. Essentially, the ALJ made two independent, alternative conclusions relevant to the IDEA when denying the parents' challenge to the IEPs.

First, the ALJ determined <u>sua sponte</u> that it was without the authority, and thus jurisdiction, to provide C.M.'s parents with retroactive relief of reimbursement for AVT under the 2002 IEP or the successor IEP. Specifically, the ALJ stated:

> Even if he agreed with the Parents that the January 2002 and 2003, IEPs were fatally flawed, the undersigned would not have the authority to order the reimbursement requested by the parents because such reimbursement is <u>not</u> of the limited type a hearing officer/Administrative Law Judge in Florida is authorized to award in a due process proceeding.... Accordingly, the Parents' request for reimbursement [of AVT expenses] is denied.

The ALJ based its conclusion on the belief that it was only authorized to reimburse for the "cost of the private school enrollment of an exceptional student who has been unilaterally moved by his parents from public school to private school under the circumstances described in 20 U.S.C. Section 1412(a)(10)(C) and 34 C.F.R. Section 300.403." (punctuation omitted). According to the ALJ, the fact that C.M. had never been enrolled in public school, let alone unilaterally removed from public school, rendered it without jurisdiction to award any reimbursement for C.M.'s AVT.

12

Second, and alternatively, the ALJ assumed that even if it had jurisdiction to award C.M. parents reimbursement for AVT, C.M.'s parents had not shown that the School Board's failure to offer AVT constituted the denial of a Free and Appropriate Public Education ("FAPE"). Specifically, the ALJ concluded that "the issue raised by the Parents in their due process hearing request as to whether AVT is a supportive service C.[M.] is entitled to receive from the School Board because such service is indispensable to enabling C.[M.] to 'access her education' remains one over which the parties still disagree." In resolving this dispute, the ALJ noted that "[a]s a hearing-impaired child with a properly functioning cochlear implant who communicates through spoken language, C.[M.] needs expressive and receptive language therapy to help her develop her oral communication skills."

The ALJ determined that "[w]hile there can be no question that C.[M.] has benefit[t]ed significantly from the AVT she has received from Ms. Bricker, AVT is not the only accepted and proven therapeutic methodology that can help C.[M.] become a better oral communicator and thereby 'access her education.'" The ALJ concluded that VT is an accepted and proven therapy and that "[i]t is the School Board's prerogative, not the Parents', to choose which of these accepted and proven methodologies will be provided at public expense."

13

Ultimately, the ALJ concluded that "even assuming that, despite C.[M.]'s voluntary enrollment in a private preschool, the Parents are entitled to have their complaint regarding the School Board's failure to provide C.[M.] with AVT heard in a due process hearing, the Parents' position that such failure on the School Board's part constitutes a denial of a FAPE in the least restrictive environment appropriate must be rejected."

C.M.'s parents then filed their complaint in district court. Their complaint sought reimbursement from the School Board for C.M.'s private AVT, transportation to and from AVT, mapping (programming) for C.M.'s cochlear implant, and batteries for C.M.'s implant.

## E. The District Court

In the district court, C.M.'s parents raised two claims: the School Board violated (1) the IDEA by refusing to provide C.M. with a FAPE in 2002 and 2003, and (2) the ADA by refusing to accommodate C.M.[6]

According to the district court, it did, "of course, have authority to review the ALJ's decision as to whether the 2002 and 2003 IEPs provided CM with a FAPE." However, the district court determined that it was "without jurisdiction to

_____

[6]C.M.'s parents sued only under the IDEA and ADA, and did not assert any state-law claims. Furthermore, C.M.'s parents do not appeal the dismissal of their ADA claim and, therefore, this opinion does not address the ADA.

14

order the School Board to reimburse CM for audio-verbal training and related expenses." Although summary in form, it appears that the district court based its conclusion on either: (1) the court's agreement with the ALJ that relief under the IDEA is precluded when the child is never enrolled in public school; or (2) that C.M.'s current enrollment in private school somehow limited the relief available to her under the IDEA. What is clear, however, is that the district court dismissed the parents' IDEA claim for lack of subject matter jurisdiction.

C.M.'s parents appeal.

## II. DISCUSSION

Before addressing the parents' appeal, we first discuss the IDEA and the procedures that should be followed in the state administrative hearing and federal district court.

### A.    The IDEA

### 1.    Free and Appropriate Public Education

The IDEA, as the successor to the Education of the Handicapped Act, represents "an ambitious federal effort to promote the education of handicapped children." Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 179, 102 S. Ct. 3034, 3037 (1982). All children with disabilities, such as C.M.'s hearing impairment, "who, by reason thereof, need[] special education and

related services" fall within the IDEA's scope. 20 U.S.C. § 1401(3)(A) & (B). "Special education" means "specially designed instruction . . . to meet the unique needs of a child with a disability," and includes instruction in the classroom, home, physical education, and other settings. 20 U.S.C. § 1401(29)(A) & (B). "Related services" include "transportation, and such developmental, corrective, and other supportive services including speech-language pathology and audiology services . . . as may be required to assist a child with a disability to benefit from special education . . . ." 20 U.S.C. § 1401(26)(A) (internal parentheses omitted).

The IDEA achieves its goals by guaranteeing students with disabilities a Free and Appropriate Public Education ("FAPE"). Loren F. v. Atlanta Independent Sch. Sys., 349 F.3d 1309, 1311 (11th Cir. 2003); Sch. Bd. of Collier County v. K.C., 285 F.3d 977, 979 (11th Cir. 2002); see 20 U.S.C. § 1400(d)(1)(A) (stating that a principal purpose of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs"). In turn, a FAPE is defined as special education services that:

> (A) have been provided at public expense, under public supervision and direction, and without charge;
> (B) meet the standards of the State educational agency;
> (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and

16

(D) are provided in conformity with the individualized education program required under section 1414(d) . . . .

20 U.S.C. § 1401(9).  Furthermore, "[t]he services and placement needed by each child with a disability to receive a FAPE must be based on the child's unique needs and not on the child's disability."  34 C.F.R. § 300.300(a)(3)(ii).

## 2.    Individualized Education Plan

To provide a child with a FAPE, the School Board formulates an IEP "during a meeting between the student's parents and school officials."  Loren F., 349 F.3d at 1312 (citing 20 U.S.C. § 1414(d)(1)(A)-(B) and N.L. v. Knox County Sch., 315 F.3d 688, 689 (6th Cir. 2003)).

More specifically, a parent is required to notify a school board or other public agency that it wishes to place a child in special education services.[7]  The parent then consents to have the child evaluated to determine whether the child is "a child with a disability" under the IDEA.  See 34 C.F.R. §§ 300.320, 300.343.

---

[7]States are still under a "child find" obligation.  According to § 1412(a)(3)(A), [a]ll children with disabilities residing in the State, including children with disabilities who are homeless children or are wards of the State and children with disabilities attending private schools, regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services.
20 U.S.C. § 1412(a)(3)(A).

17

Once a child is evaluated and determined to be "a child with a disability" under the IDEA, an "IEP team" is formed. See 34 C.F.R. § 300.344(a). The IEP team normally includes the parents, a regular education teacher, at least one special education teacher, a School Board representative, other individuals with relevant expertise, and the child (if appropriate). Id. at §§ 300.344(a)(1) - (7).

Once the IEP team is formed, meetings are held and an IEP is developed. See 20 U.S.C. § 1414(d)(1)(A)(i) (describing the necessary contents of an IEP). During the IEP-development process, parental involvement is critical; indeed, full parental involvement is the purpose of many of the IDEA's procedural requirements. See Doe v. Alabama State Dep't of Educ., 915 F.2d 651, 661 (11th Cir. 1990); see also Weber v. Cranston Sch. Comm., 212 F.3d 41, 51 (1st Cir. 2000); 34 C.F.R. § 300.345 (outlining parental involvement in the IEP process).

Once an IEP is developed, the School Board must determine whether it will provide the special education needs of the child. See Sch. Comm. of Town of Burlington v. Dep't of Educ., 471 U.S. 359, 369, 105 S. Ct. 1996, 2002 (1985) ("The Act contemplates that such education will be provided where possible in regular public schools, with the child participating as much as possible in the same activities as nonhandicapped children, but the Act also provides for placement in private schools at public expense where this is not possible.") (citations omitted);

18

Loren F., 349 F.3d at 1312 ("Although the IDEA reflects a structural preference in favor of providing special education in public schools, it recognizes that certain public schools are unable or unwilling to provide appropriate special education services."). If the School Board elects not to provide the programs outlined in the IEP, it refers the child to a private school or program at no cost to the parents. See 20 U.S.C. § 1412(a)(10)(B)(i); 34 C.F.R. § 300.401.

If, however, the School Board elects to provide the services outlined in the IEP, one of three things will happen. First, the parents can enroll their child in public school and the school is required to provide for the services outlined in the IEP. See 34 C.F.R. § 300.342 (outlining when IEPs must be in effect).

Second, the parents can acknowledge that the IEP is sufficiently adequate to provide a FAPE but decide that their child's educational needs are better met by voluntarily enrolling their child in a private school or program. If the parents elect this option, the School Board is not required to reimburse the parents for any cost associated with the child's voluntary enrollment in private school. See 20 U.S.C. § 1412(a)(10)(C)(i); 34 C.F.R. § 300.454(a)(1).

Third, the parents can notify the school that they are rejecting the IEP and then challenge the IEP via a due process hearing. See 20 U.S.C. §§ 1412(a)(6)(A) & 1415(a)-(o); 34 C.F.R. § 300.403(b). Should the parents successfully challenge

the IEP and if it is determined that the placement in private school was proper, "a court or a hearing officer may require [the School Board] to reimburse the parents for the cost of that enrollment . . . ." 20 U.S.C. § 1412(a)(10)(C)(ii); see 34 C.F.R. 300.403(c) ("[A] court or a hearing officer may require the agency to reimburse the parents for the cost of that [private school] enrollment if . . . the agency had not made FAPE available to the child in a timely manner prior to that enrollment and . . . the private placement is appropriate.").

We now discuss the ALJ's and district court's roles under the IDEA.

## B.    The ALJ

Should parents elect to challenge an IEP, they are entitled to a due process hearing before an ALJ. See 20 U.S.C. §§ 1412(a)(6)(A) & 1415(a)-(o); 34 C.F.R. § 300.403(b). The Supreme Court has established a two-part test to determine whether a student has been denied a FAPE. Rowley, 458 U.S. at 206-07, 102 S. Ct. at 3051.[8]

Under the Rowley test, the ALJ must first determine whether the School Board "complied with the procedures set forth in the [IDEA]." Id. at 206; 102 S. Ct. at 3051. If the School Board complied with the procedural requirements of the

---

[8]"The burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief." Schaffer v. Weast, 126 S. Ct. 528, 537 (2005).

IDEA (i.e., it properly formed an IEP team and gave the parents sufficient involvement in the IEP formation), then the ALJ must determine whether the IEP was "reasonably calculated to enable the child to receive educational benefits." Id. at 207, 102 S. Ct. at 3051.

If the ALJ determines that the School Board complied with the IDEA's procedural requirements and the proposed IEP provided the child with the necessary services, then the State will have provided the child with a FAPE. Id. If, however, the ALJ determines that the School Board failed to comply with the IDEA's procedural requirements or proposed an inadequate IEP, the ALJ may order the Board to "reimburse the parents for the cost of that enrollment." 20 U.S.C. § 1412(a)(10)(C)(ii); see 34 C.F.R. 300.403(c). Furthermore, the ALJ may order the parents to be reimbursed for any year in which the School Board failed to provide the child with a FAPE. See Burlington, 471 U.S. at 370, 105 S. Ct. at 2003.

Having outlined the ALJ's proper role, we next discuss the district court's role under the IDEA.

## C. The District Court

The IDEA authorizes an "aggrieved" party to bring an action in federal court challenging the ALJ's final decision. 20 U.S.C. § 1415(i)(2)(A).[9] Although the federal action is an independent civil action and not merely a review of a state administrative decision, the Supreme Court has determined that federal courts must still give "due weight" to the ALJ's determinations. See Rowley, 458 U.S. at 206, 102 S. Ct. at 3051; Loren F., 349 F.3d at 1314. "To that end, administrative factfindings are considered to be prima facie correct, and if a reviewing court fails to adhere to them, it is obliged to explain why." Loren F., 349 F.3d at 1314 n.5 (internal quotation marks and citations omitted).[10]

The district court answers the same two-part inquiry as outlined above: namely, whether the School Board followed the IDEA's procedural requirement and whether the proposed IEP was sufficient to provide the child with a FAPE. Rowley, 458 U.S. at 206-07, 102 S. Ct. 3034, 3051; Loren F., 349 F.3d at 1312. "A 'yes' answer to both questions ends judicial review." Loren F. 349 F.3d at 1312; see Rowley, 458 U.S. at 207, 102 S. Ct. at 3051 ("If these requirements are

_____

[9]On July 18, 2003, C.M.'s parents, as an "aggrieved" party, brought this federal action expressly under 20 U.S.C. § 1415(i)(2)(A), and their action challenges the ALJ's final decision, dated June 25, 2003, under the IDEA.

[10]Unless the district court hears additional evidence or testimony, "this court stands in the same shoes as the district court in reviewing the administrative record and may, therefore, accept the conclusions of the ALJ and district court that are supported by the record and reject those that are not." Loren F., 349 F.3d at 1314 (internal quotation marks and citations omitted).

met, the State has complied with the obligations imposed by Congress and the courts can require no more.").

However, should the district court determine either that the School Board failed to follow the IDEA's procedural requirements or that the IEP was not reasonably calculated to enable the student to receive education benefits, it "shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1439(a)(1); see also 20 U.S.C. § 1412(a)(10)(C)(ii) ("a court or a hearing officer may require [the School Board] to reimburse the parents for the cost of that enrollment"); 34 C.F.R. 300.403(c) ("[A] court or a hearing officer may require the agency to reimburse the parents for the cost of that [private school] enrollment if . . . the agency had not made FAPE available to the child in a timely manner prior to that enrollment and . . . the private placement is appropriate."). The reviewing court has broad discretion in determining what is appropriate based on the circumstances of each case. See Burlington, 471 U.S. at 369, 105 S. Ct. at 2002.

Having outlined the relevant IDEA provisions and the proper roles of the ALJ and district court, we now turn to the issues presented in this appeal.

## D.     Reimbursement for Private School and Related Services

The first issue presented in this appeal is whether C.M.'s parents are entitled to any form of reimbursement given that C.M. is currently enrolled in private

school and was never enrolled in public school. For the following reasons, we conclude that C.M. would be eligible for reimbursement for tuition and related services if the School Board had denied her a FAPE.

Section 1412(a)(10)(C)(ii) states:

> If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary school or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.

20 U.S.C. § 1412(a)(10)(C)(ii) (emphasis added); see 34 C.F.R. 300.403(c) (specifying that private preschool enrollment can be reimbursed). The School Board and ALJ in this case relied on the phrase "who previously received special education and related services under the authority of a public agency" to conclude that C.M.'s parents are not entitled to reimbursement because C.M. was never enrolled in public school. Furthermore, the district court clearly indicated that C.M.'s current enrollment in private school factored into the determination that it was without jurisdiction to award relief. There are, however, two fatal flaws with this line of reasoning.

First, C.M. actually "received special education and related services under the authority of a public agency" as provided under § 1412(a)(10)(C)(ii). As stated above, C.M. previously received AVT until the age of three through the Miami-Dade County Early Intervention Program. In addition, until the age of three, C.M. received oral motor therapy and other special education services under the authority of a public agency. Consequently, if the School Board failed to offer C.M. a FAPE, she satisfies the precondition in § 1412(a)(10)(C)(ii) for reimbursement.

Second, sole reliance on the fact that C.M. never attended public school is legally insufficient to deny reimbursement under § 1412(a)(10)(C)(ii). In Burlington, the United States Supreme Court recognized the difficult decisions facing parents of children with disabilities. As the Supreme Court recognized,

> [a] final judicial decision on the merits of an IEP will in most instances come a year or more after the school term covered by that IEP has passed. In the meantime, the parents who disagree with the proposed IEP are faced with a choice: go along with the IEP to the detriment of their child if it turns out to be inappropriate or pay for what they consider to be the appropriate placement. If they choose the latter course, which conscientious parents who have adequate means and who are reasonably confident of their assessment normally would, it would be an empty victory to have a court tell them several years later that they were right but that these expenditures could not in a proper case be reimbursed by the school officials. If that were the case, the child's right to a *free* appropriate public education, the parents' right to

25

participate fully in developing a proper IEP, and all of the procedural safeguards would be less than complete.

Burlington, 471 U.S. at 370, 105 S. Ct. at 2003; see Florence County Sch. Dist. Four v. Carter By and Through Carter, 510 U.S. 7, 13-14, 114 S. Ct. 361, 365 (1993) (acknowledging "the right of unilateral withdrawal recognized in Burlington" and stating that "[i]n this case, as in all Burlington reimbursement cases, the parents' rejection of the school district's proposed IEP is the very reason for the parents' decision to put their child in a private school. . . . Moreover, IDEA was intended to ensure that children with disabilities receive an education that is both appropriate and free. To read the provisions of [the IDEA] to bar reimbursement in the circumstances of this case would defeat this statutory purpose.") (internal citations omitted).

Relying, in part, on the Burlington line of cases, courts have concluded that even when a child has never enrolled in a public school, reimbursement is proper if the School Board failed to offer a sufficient IEP and, in turn, a FAPE. See E.W. v. Sch. Bd. of Miami-Dade, 307 F.Supp.2d 1363, 1370 (S.D. Fla. 2004); Justin G. v. Bd. of Educ. of Montgomery County, 148 F.Supp.2d 576, 587 (D. Md. 2001); Suzawith v. Green Bay Area Sch. Dist., 132 F.Supp.2d 718, 728 (E.D. Wis. 2000); Hoffman v. East Troy Cmty. Sch. Dist., 38 F.Supp.2d 750, 761 (E.D. Wis. 1999);

26

but see Baltimore City Bd. of Sch. Comm'rs. v. Taylorch., 395 F.Supp.2d 246, 249 (D. Md. 2005). We find the rationale contained in Justin G. to be particularly pellucid.

In Justin G., the School Board argued that § 1412(a)(10)(C)(ii) barred reimbursement "because Justin was never enrolled in the public school system." Justin G., 148 F.Supp.2d at 587. We agree with the Justin G. Court "that such a construction of the IDEA would produce the absurd result of barring children from receiving a FAPE because their disabilities were detected before they reached school age." Id. Furthermore, the School Board's "disturbing interpretation would also place parents of such children in the untenable position of acquiescing to an inappropriate placement in order to preserve their right to reimbursement." Id.

We agree that forcing parents into accepting inadequate IEPs in order to preserve their right to reimbursement runs contrary to the rights recognized in the Burlington line of cases. Therefore, we conclude that parents are not required in all cases to first enroll their child in public school pursuant to an inadequate IEP in order to preserve their right to reimbursement. See id. ("The Supreme Court has expressly rejected saddling parents of disabled children with such a pyrrhic victory.") (citing Burlington, 471 U.S. at 369-70, 105 S. Ct. at 2003); but see

27

Baltimore City, 395 F.Supp.2d at 250 (requiring that, in order to preserve the right to reimbursement, "parents may place their child in a public school for as short a period as one day, give ten business days' written notice to the school that they are withdrawing the child, and then do so") (citing 20 U.S.C. § 1412(a)(10)(C)(iii)(I)(bb)).

Having determined that C.M.'s parents would be eligible for reimbursement if C.M. had been denied a FAPE, we next turn to the issue of what expenses parents are potentially entitled to have reimbursed under the IDEA.

## E.     Forms of Reimbursement

There seems to be some dispute among the parties as to what type of expenses C.M.'s parents could be reimbursed for under the IDEA.  In particular, could C.M.'s parents be reimbursed for only tuition or also for related services, such as AVT?[11]

In Burlington, the United States Supreme Court concluded that retroactive reimbursement for private school tuition and related services was authorized under the IDEA.  Burlington, 471 U.S. at 369, 105 S. Ct. at 2002; Jenkins v. State of Fla., 815 F.2d 629, 630 (11th Cir. 1987) (noting that the Burlington Court

---

[11]In this regard, the district court relied heavily on E.W. v. Sch. Bd. of Miami-Dade, 307 F.Supp.2d 1363 (S.D. Fla. 2004), and the E.W. decision has some language which arguably could be construed as limiting parents to tuition expenses when a FAPE is not provided.

concluded that the statute "includes reimbursement of private school tuition and related expenses"); see Shore Regional High Sch. Bd. of Educ. v. P.S., 381 F.3d 194, 197, 201-02 (3d Cir. 2004) (affirming the ALJ's order that the School Board "reimburse P.S. for the out-of-district tuition and related costs"); Susquenita Sch. Dist. v. Raelee S., 96 F.3d 78, 85 (3d Cir. 1996) (stating that the Burlington Court concluded that the IDEA authorizes "reimbursement to parents for private school tuition and related expenses") (internal quotation marks and citations omitted); Babb v. Knox County Sch. Sys., 965 F.2d 104, 107 (6th Cir. 1992) ("The Supreme Court found that . . . such reimbursement to parents for private school tuition and related expenses was appropriate.") (citing Burlington, 471 U.S. at 369, 105 S. Ct. at 2002); Tice v. Botetourt County Sch. Bd., 908 F.2d 1200, 1206 (4th Cir. 1990) ("If the Tices can prove these placements [in private school] were proper, then they are entitled to reimbursement of all special education and related services expenses."); Bd. of Educ. of Cabell County v. Dienelt, 843 F.2d 813, 813 (4th Cir. 1988) (affirming a "judgment [that] ordered the Board to reimburse the Dienelts for $67,838.32 in tuition and related expenses of placing Paul in a private school").

What constitutes private school tuition is self-evident. Furthermore, the IDEA expansively defines "related services" as meaning

29

transportation, and such developmental, corrective, and other supportive services (including speech-language pathology and audiology services, interpreting services, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, school nurse services designed to enable a child with a disability to receive a free appropriate public education as described in the individualized education program of the child, counseling services, including rehabilitation counseling, orientation and mobility services, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children.

20 U.S.C. § 1401(26)(A).

Thus, if the Board failed to offer C.M. a FAPE, the parents would be entitled to reimbursement for private school tuition (to the extent the parents actually paid any) and related services. Related services, for the purposes of this case, would include C.M.'s private AVT, transportation to and from AVT, mapping (programming) for C.M.'s cochlear implant, and batteries for C.M.'s implant. In the scenario where parents request a FAPE for their child and the Board fails to offer a FAPE, the parents' placement of their child in private school is not considered voluntary.

However, if the School Board offered C.M. a FAPE, then the parents are not entitled to reimbursement under the IDEA for either private school tuition or related services. See Rowley, 458 U.S. at 207, 102 S. Ct. at 3051 ("If these

30

requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more."). Essentially, once the Board offers a FAPE, the parents' decision to place their child in private school is viewed as being voluntary, and the School Board, under the IDEA, is not required to reimburse the parents for any cost associated with the child's voluntary enrollment in private school. See 20 U.S.C. § 1412(a)(10)(C)(i); 34 C.F.R. § 300.454(a)(1). Furthermore, once voluntarily placed in a private school, the child does not have a right under the IDEA to receive the same level of special education and related services that would be required under the IDEA's requirement of a FAPE. See 34 C.F.R. 300.454(a)(1) ("No private school child with a disability has an individual right to receive some or all of the special education and related services that the child would receive if enrolled in a public school.").

In sum, in this case, C.M.'s parents requested a FAPE and claim that the IEPs did not provide a FAPE. Thus, the ALJ and the district court did have jurisdiction to award C.M.'s parents reimbursement for tuition and related services, such as AVT, if C.M. had been denied a FAPE.

Having outlined what types of expenses parents are entitled to be reimbursed for under the IDEA, we next address the parents' claim that the two IEPs did not provide C.M. with a FAPE.[12]

## F.     The Parents' Claim for Reimbursement in Their Federal Complaint

In this case, the parents' only complaint about either the first or second IEP was that each one did not provide C.M. with AVT.[13]  Thus, there is no issue as to whether the School Board complied with the IDEA's procedural requirements. The sole issue is whether the two proposed IEPs, which provided for VT instead of AVT, were "reasonably calculated to enable the child to receive educational benefits," and, thus, were sufficient to provide C.M. with a FAPE.  Rowley, 458 U.S. at 207, 102 S. Ct. at 3051.

---

[12]This case involves plaintiffs' claims for reimbursement under the IDEA on the basis that AVT was a necessary part of a FAPE, and, thus, the School Board denied C.M. a FAPE when its IEPs did not include AVT.  We recognize that the State of Florida has a separate complaint procedure, see Fla. Admin. Code Ann. R. 6A-6.03314(6), that may provide C.M.'s parents with additional rights.  However, this case does not involve any claims based on Florida's separate complaint procedure in Rule 6A-6.03314(6).

[13]The parents' complaint and appellate brief emphasize the numerous differences between AVT and VT.  According to C.M.'s parents, these differences include class structure, parental involvement, developmental techniques, modes of communication, and others.  C.M.'s parents particularly stress that VT is conducted in a group setting and that none of the teachers are trained in AVT.  However, under the IDEA, the issue is not whether AVT and VT are different (they obviously are), but rather whether the School Board's proposed IEPs, which included only VT, were reasonably calculated to enable C.M. to receive educational benefits.

The ALJ determined that "[w]hile there can be no question that C.[M.] has benefit[t]ed significantly from the AVT she has received from Ms. Bricker, AVT is not the only accepted and proven therapeutic methodology that can help C.[M.] become a better oral communicator and thereby 'access her education.'" The ALJ concluded that VT was an accepted and proven therapy and that "[i]t is the School Board's prerogative, not the Parents', to choose which of these accepted and proven methodologies will be provided at public expense." Consequently, the ALJ determined that the proposed IEPs were sufficient to provide C.M. with a FAPE.

As an aggrieved party, C.M.'s parents filed a civil complaint in federal court asserting that they were entitled to reimbursement because the proposed IEPs did not provide C.M. with a FAPE. See 20 U.S.C. § 1415(i)(2)(A). However, the parents' complaint is devoted to the differences between AVT and VT, and how forcing C.M. to switch to VT was "against the parents' choice of a communication mode," posed "a significant risk of regression," and did not meet C.M.'s unique needs. Nowhere in the parents' complaint do they claim that VT is not a recognized and well-established form of therapy for deaf children.

The district court first acknowledged that it did have jurisdiction to entertain a challenge to the sufficiency of an IEP. However, the district court dismissed the

33

parents' complaint for lack of subject matter jurisdiction. We agree that the parents' complaint should have been dismissed; however, it should have been dismissed for failure to state a viable claim for relief under the IDEA, not for lack of subject matter jurisdiction.

The dispute in this case boils down to the parents' belief that AVT is the program best suited to provide C.M. with a quality education. However, under the IDEA there is no entitlement to the "best" program. See Rowley, 458 U.S. at 204, 102 S. Ct. at 3049 (The IEP "should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade."); Lachman v. Illinois Bd. of Educ., 852 F.2d 290, 297 (7th Cir. 1988) ("Rowley and its progeny leave no doubt that parents, no matter how well-motivated, do not have a right under the [statute] to compel a school district to provide a specific program or employ a specific methodology in providing for the education of their handicapped child.") (citations omitted); see also Loren F., 349 F.3d at 1312 n.1 (stating that under the IDEA, the FAPE described in the IEP "need not be the best possible one") (internal quotation marks and citations omitted); Pace v. Bogalusa City Sch. Bd., 403 F.3d 272, 291 (5th Cir. 2005) (en banc) (A FAPE "need not be the best possible education nor one that will maximize the child's educational potential.") (citations omitted); White v. Ascension Parish Sch. Bd., 343 F.3d 373, 378 (5th

Cir. 2003) (Under IDEA, the FAPE "need not maximize the child's potential; it must guarantee a basic floor of opportunity.") (internal quotation marks and citations omitted); Kings Local Sch. Dist. Bd. of Educ. v. Zelazny, 325 F.3d 724, 729 (6th Cir. 2003) (stating that the IDEA does not "require public schools to maximize the potential of disabled students"); Neosho R-V Sch. Dist. v. Clark, 315 F.3d 1022, 1027 (8th Cir. 2003) (The IDEA "does not require that a school either maximize a student's potential or provide the best possible education at public expense.  Instead, the requirements of the IDEA are satisfied when a school district provides individualized education and services sufficient to provide disabled children with some educational benefit.") (internal quotation marks and citations omitted); T.R. v. Kingwood Tp. Bd. of Educ., 205 F.3d 572, 577 (3d Cir. 2000) ("The education provided [pursuant to the IDEA] must be sufficient to confer some educational benefit upon the handicapped child, although the state is not required to maximize the potential of handicapped children.") (internal quotation marks and citations omitted); JSK v. Hendry County Sch. Bd., 941 F.2d 1563, 1573 (11th Cir. 1991) ("While a trifle might not represent 'adequate' benefits, . . .  maximum improvement is never required."); Gregory K. v. Longview Sch. Dist., 811 F.2d 1307, 1314 (9th Cir. 1987) ("An 'appropriate'

public education does not mean the absolutely best or 'potential-maximizing' education for the individual child.") (citations omitted).

C.M.'s parents may be correct that VT would confuse C.M. and that the classroom dynamics offered by the School Board would not be most suitable for C.M. However, C.M.'s parents never challenged the School Board's assertion, or the ALJ's conclusion, that VT is a well-recognized means by which to teach hearing-impaired children to speak. While C.M.'s parents may not want such a program, the IDEA does not grant them a right to select among various programs. Rather, the School Board offered C.M. what was required under the IDEA – a free appropriate public education.

Because C.M.'s parents are merely asserting that AVT is the best and most desirable method to educate C.M., they have failed to state a claim under the IDEA. The IDEA does not permit them to challenge an IEP on the grounds that it is not the best or most desirable program for their child. Consequently, we affirm the district court's dismissal but remand this case with directions for the district court to modify the dismissal as one for failure to state a viable claim for relief under the IDEA.

AFFIRMED and REMANDED with INSTRUCTIONS.