[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APR 3, 2007
THOMAS K. KAHN
CLERK

_____

No. 05-15188

_____

D.C. Docket No. 04-60297 CV-KAM

D.P., o.b.o. E.P., D.P. and K.P.,
L.P., o.b.o. E.P., D.P. and K.P.,

Plaintiffs-Appellants,

versus

SCHOOL BOARD OF BROWARD COUNTY,

Defendant-Appellee.

_____

No. 05-15193

_____

D.C. Docket No. 04-61461 CV-KAM

L.M.P., on behalf of E.P., D.P. and K.P.,

Plaintiff-Appellant,

versus

THE SCHOOL BOARD OF BROWARD COUNTY, FLORIDA

Defendant-Appellee.

Appeals from the United States District Court
for the Southern District of Florida

**(April 3, 2007)**

Before EDMONDSON, Chief Judge, BARKETT and COX, Circuit Judges.

COX, Circuit Judge:

We consider in these consolidated appeals whether the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq., ("IDEA") requires a school board to continue providing services to children who have reached three years of age pursuant to Individualized Family Service Plans previously developed for those children under Part C of the IDEA until such time as Individualized Educational Plans are developed for the children under Part B of the IDEA. We conclude that it does not. Therefore, we affirm the district court's judgments of dismissal.

## I. BACKGROUND & PROCEDURAL HISTORY

D.P., E.P., and K.P. are autistic triplets who live with their parents (collectively, "Appellants") in Broward County, Florida. Prior to their third birthday, the triplets received individualized care under the Early Intervention Program administered under Part C of the IDEA. The services provided the triplets under Part C of the IDEA were provided pursuant to Individualized Family Service Plans

2

("IFSPs"). Pursuant to IFSPs, disabled infants and toddlers may be provided with developmental services such as speech, occupational, and physical therapy services; medical services for diagnosis and evaluation purposes; and social work services. 20 U.S.C. § 1432(4)(E). While IFSPs may include an educational component, they do not necessarily include such a component. *Id.*

On January 4, 2004, the triplets turned three and "aged out" of the Part C program. At the same time, they became eligible for services under Part B of the IDEA. Part B of the IDEA guarantees free appropriate public education ("FAPE") to disabled children older than three. Services provided under Part B of the IDEA are generally provided pursuant to Individualized Educational Plans ("IEPs") rather than IFSPs. IEPs differ from IFSPs in that they are focused on the educational needs of disabled children. 20 U.S.C. § 1414(d)(1)(A). However, at the time the triplets turned three, no IEPs had been developed for them.

On January 6, 2004, the Appellants initiated an administrative action by filing a due process complaint pursuant to the IDEA's provisions. The due process complaint alleged that the School Board of Broward County ("the Board") was contemplating modifying the services provided in the triplets' last IFSPs and sought an injunction requiring the Board to continue the services in the IFSPs. Appellants purported to invoke the "stay put" provision in Part B of the IDEA, 20 U.S.C. §

3

1415(j). On January 9, 2004, an Administrative Law Judge ("ALJ") held a telephone conference with the parties to the administrative action during which the parties agreed that no evidentiary hearings were necessary as the dispute presented only questions of law that could be resolved on papers submitted by the parties. After the matter had been fully briefed, the ALJ issued an order holding that the "stay put" provision did not require the Board to provide services pursuant to the triplets' last IFSPs. The ALJ denied Appellants' requests for injunctive relief, for reimbursement of the costs Appellants had incurred in continuing the services previously provided under the IFSPs, and for attorneys' fees and costs. Appellants appealed the ALJ's order to the federal district court in a case styled *D.P. and L.P., on behalf of E.P., D.P., and K.P. v. School Board of Broward County* ("*D.P. I*"). The complaint in *D.P. I* requested a declaration that the Board must continue the services provided to the triplets pursuant to the IFSPs, an injunction requiring the Board to do so, and reimbursement of the costs Appellants had incurred in continuing the services previously provided under the IFSPs.

On August 17, 2004, while *D.P. I* was still pending in the district court, Appellants filed another due process complaint alleging, among other things, that the Board had failed to have IEPs in place for the triplets on their third birthday and that, instead, the Board belatedly had developed temporary IEPs for the triplets. The

temporary IEPs proposed placement of the triplets in the Baudhuin Preschool for pre-kindergarten children with autism. Appellants alleged that the temporary IEPs were invalid by reason of the parents' refusal to consent to them. This second administrative action sought a declaration that the temporary IEPs were invalid and an injunction requiring the Board to provide the triplets with services pursuant to their last IFSPs until valid IEPs were in place. It also sought reimbursement from the Board for the costs that the parents had incurred in continuing the services previously provided under the IFSPs. Appellants requested that the ALJ first resolve (without an evidentiary hearing) the legal issues of whether the temporary IEPs were invalid and, if so, what remedy was due. After receiving briefing on those questions, the ALJ determined that the temporary IEPs were invalid because the parents had never consented to them. However, the ALJ also found that nothing in the IDEA or Florida law obligated the Board, as a result of the parents' refusal to consent to the temporary IEPs, to provide the triplets with the Early Intervention Services they had been receiving previously under Part C of the IDEA. The ALJ denied Appellants' requests for reimbursement. Finally, the ALJ ordered Appellants to file a statement indicating whether, in light of the resolution of the threshold questions, Appellants believed there to be any remaining unresolved issues in their action. Appellants filed no such

statement. Instead, they filed a complaint in the district court challenging the ALJ's decision.

The second district court case was styled *L.M.P. on behalf of D.P., K.P., and E.P. v. School Board of Broward County* ("*D.P. II*"). In *D.P. II*, Appellants claimed that the Board failed to provide the triplets with FAPE as required by the IDEA. Appellants asked the district court to declare the temporary IEPs invalid, order the Board to reimburse Appellants for the costs they had incurred in continuing the services formerly provided under the IFSPs, order the Board to continue the services provided under the IFSPs, and award Appellants attorneys' fees and costs.

The Board moved to dismiss *D.P. I* and *D.P. II*, arguing in both cases that Appellants' claims failed as a matter of law because neither the IDEA nor any other provision of law requires the Board to continue to provide services to the triplets pursuant to their IFSPs until valid IEPs are in place.

On March 8, 2005, the district court granted the Board's motion to dismiss the complaint in *D.P. I* pursuant to Fed. R. Civ. P. 12(b)(6). On August 19, 2005, the district court granted the Board's motion to dismiss in *D.P. II*, also for failure to state a claim upon which relief can be granted. Judgment was entered for the Board in both cases. Appellants appealed both judgments to this court, and we consolidated the cases on appeal.

## II. CONTENTIONS OF THE PARTIES & ISSUES ON APPEAL

Appellants contend that the IDEA entitles the triplets to continued services pursuant to their IFSPs until valid IEPs are put in place for them. Appellants further contend that, because the parents did not consent to the temporary IEPs proposed by the Board, there are no valid IEPs for the triplets. They argue that the district court erred in refusing to issue an injunction requiring the Board to provide the services previously provided under the IFSPs.

The Board contends that the IDEA imposes no duty to continue to provide services under IFSPs to children who have reached age three. The Board also argues that, according to the plain language of the IDEA's "stay put" provision, because the triplets have never enrolled in public school, the proper placement for them while an IEP is not yet in place is the public school program.

## III. STANDARD OF REVIEW

We review de novo the district court's grant of a motion to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim, accepting the factual allegations in the complaint as true and construing them in the light most favorable to the plaintiff. *Glover v. Liggett Group, Inc.*, 459 F.3d 1304, 1308 (11th Cir. 2006) (citing *Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003)). Dismissal is appropriate "when, on the basis of a dispositive issue of law, no construction of the factual allegations will

support the cause of action." *Marshall County Bd. of Educ. v. Marshall County Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993).

## IV. DISCUSSION

In the orders granting the motions to dismiss, the district court relied on the plain language of the pendency, or "stay put," provision of the IDEA to hold that the statute does not require the Board to provide the services that had previously been provided under the IFSPs. We have said, "'In construing a statute we must begin, and often should end as well, with the language of the statute itself.' . . . Where the language Congress chose to express its intent is clear and unambiguous, that is as far as we go to ascertain its intent because we must presume that Congress said what it meant and meant what it said." *United States v. Steele*, 147 F.3d 1316, 1318 (11th Cir. 1998) (quoting *Merritt v. Dillard*, 120 F.3d 1181, 1185 (11th Cir. 1997) (other citations omitted).

The "stay put" provision, which governs during the course of all administrative and judicial proceedings regarding a child's proper placement under Part B of the IDEA, says:

> Maintenance of current educational placement
>
> [D]uring the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the

8

child shall remain in the then-current educational placement of the child, or, if applying for initial admission to a public school, shall, with the consent of the parents, be placed in the public school program until all such proceedings have been completed.

20 U.S.C. § 1415(j).

Appellants contend that, through use of the disjunctive "or," the statutory provision provides alternative placements for the triplets. According to Appellants, while their due process requests were pending, the triplets could have been placed in the public school program or they could have remained in their then-current educational placement. Appellants cite a Third Circuit case, *Pardini v. Allegheny Intermediate Unit*, 420 F.3d 181 (3d Cir. 2005), to support their contention that the triplets "then-current educational placement" was the last IFSP from the Early Intervention Program.

We find Appellants' argument unpersuasive in light of the unambiguous language of the statute. The disjunctive "or" does indeed provide alternatives; but, contrary to Appellants' contention, the alternatives separated by the "or" are mutually exclusive. As the district court stated, if the educational agency (here, the Board) and parents do not agree to a placement for the child, which of the other two alternatives applies depends on one fact only – whether the child is applying for initial admission to a public school. If the child is not applying for initial admission, he shall remain

9

in his existing educational placement. *Or*, if the child is applying for initial admission, he shall be placed in the public school program. We reach this conclusion based upon the placement of the disjunctive coordinating conjunction – between the two alternatives, but before the imperative, "if applying for initial admission to a public school [the student] shall . . . be placed in the public school program."

In this case, Appellants do not contest the fact that the triplets have never been admitted to a public school program. Therefore, the triplets are "applying for initial admission to a public school." And, in the absence of an agreement otherwise between the Board and the triplets' parents, the only placement available to the triplets is the public school program. The district court properly held that the fact that the parents withheld consent to placement in the program offered by the public school (pursuant to the temporary IEPs) does not create another option for the triplets. Without the parents' consent, the triplets cannot be placed in the public school program; but, they are not entitled to an alternative placement pursuant to the statute. In other words, the IDEA does not entitle the triplets to continue receiving services pursuant to their IFSPs until such time as valid IEPs are put in place for them.[1]

---

[1]The dissent maintains that our holding requires the triplets to enter public school, without any accommodation whatsoever and without any remedy. That conclusion is based upon neither the facts of this case nor our legal analysis. The "public school placement" that the triplets were offered by the school board is, in fact, enrollment at the Mailman Segal Institute's Baudhuin Preschool, located on the main campus of Nova Southeastern University. The Baudhuin Preschool is a private school for pre-kindergarten-aged children with autism.

10

We acknowledge that our decision is at odds with the Third Circuit's holding in *Pardini*. We think that case was incorrectly decided. As stated above, we base our conclusions on the plain language of the "stay put" provision. We do note, however, that our interpretation of the statute is consistent with that of the Department of Education. The implementing regulation in effect at the time Appellants filed their due process requests stated:

> If the [due process] complaint involves an application for initial admission to public school, the child, with the consent of the parents, must be placed in the public school until the completion of all the proceedings.

34 C.F.R. § 300.514(b).[2]

---

The triplets' parents rejected this placement, as is their right under the IDEA. Having done so, they could have continued private services and challenged the school board's plan in a due process hearing and, if necessary, a subsequent lawsuit in which they attempted to prove that the school board had denied the triplets FAPE. Had they been successful, the parents would have been able to receive reimbursement from the school board for the costs of the private services that replaced the FAPE their children were wrongly denied. *See M.M. ex rel. C.M. v. Sch. Bd. of Miami-Dade County, Fla.*, 437 F.3d 1085, 1098-99 (11th Cir. 2006).

However, while the triplets' parents alleged in their due process requests that their children had been denied FAPE, they chose not to present evidence supporting their FAPE allegations. Therefore, no determination has ever been made as to whether the Board denied the triplets FAPE.

[2]The regulation has since been revised. The same language now appears in 34 C.F.R. § 300.518(b) (effective Oct. 13, 2006). Subsection (c) of the revised regulation reads, in part:

> If the complaint involves an application for initial services under this part from a child who is transitioning from Part C of the Act to Part B and is no longer eligible for Part C services because the child has turned three, the public agency is not required to provide the Part C services that the child had been receiving.

34 C.F.R. § 300.518(c).

Our interpretation is also consistent with other agency guidance on the proper pendency placement for children transitioning from Part C to Part B of the IDEA. That guidance, issued by the Office of Special Education Programs within the Office of Special Education and Rehabilitative Services of the United States Department of Education, is published in the Federal Register with the implementing regulations for the statute. It states:

> Comment: A few commenters requested that the regulation be revised to make clear that the pendency provisions of § 300.514 apply to children transitioning from early intervention services under Part C to preschool special education and related services under Part B.
>
> Discussion: The pendency provision at § 300.514(a) does not apply when a child is transitioning from a program developed under Part C to provide appropriate early intervention services into a program developed under Part B to provide FAPE. Under § 300.514(b), if the complaint requesting due process involves the child's initial admission to public school, the public agency responsible for providing FAPE to the child must place that child, with the consent of the parent, into a public preschool program if the public agency offers preschool services directly or through contract or other arrangement to nondisabled preschool-aged children until the completion of authorized review proceedings.
>
> Changes: None.

64 Fed. Reg. 12,406, 12,558 (Mar. 12, 1999).

Because we rely on the plain language of the "stay put" provision, we do not engage in analysis to determine whether the agency's interpretation of the statute is reasonable and therefore entitled to deference. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43, 104 S. Ct. 2778, 2781-82 (1984) (stating that, where the statute is clear, that is the "end of the matter"). We simply note its consistency with our reading.

Appellants argue that they should have been granted an injunction pursuant to the "stay put" provision or Fed. R. Civ. P. 65. But, we do not find any error in the district court's denial of the injunction. As stated above, the IDEA does not provide for continued provision of services to the triplets pursuant to their IFSPs. And, for that reason, Appellants did not (and cannot) carry their burden of demonstrating a substantial likelihood of success on the merits of their claim. *See Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc).[3]

The dissent claims that our holding is inconsistent with *M.M. ex rel. C.M. v. Sch. Bd. of Miami-Dade County, Fla.*, 437 F.3d 1085 (11th Cir. 2006). It is not.

---

[3]The Board also moved to dismiss Appellants' claims for reimbursement of expenses incurred by continuing to provide the services previously provided under the IFSPs because the Board had failed to provide the triplets with FAPE on the ground that Appellants had failed to exhaust their administrative remedies as to those claims. The district court found that the reimbursement requests were premature because the ALJ had not determined whether the triplets had been denied FAPE. It is unclear whether Appellants seek review of the district court's dismissal without prejudice of these claims. We find no reversible error in the dismissals without prejudice.

13

*M.M.* does not hold (as the dissent states) that the plaintiffs in that case were eligible for reimbursement because their child had received early intervention services. To the contrary, our opinion in that case affirmed dismissal of the plaintiffs' claim for reimbursement because the complaint failed to state a claim that the child was denied FAPE. *See id.* at 1103. And, though *M.M.* recognizes that reimbursement may be available for services rendered after a child's third birthday, that case does not hold that a school board can be enjoined to continue providing services previously rendered pursuant to an IFSP after a child's third birthday or even that, in the case where FAPE has been denied, all services previously rendered pursuant to an IFSP are reimbursable. As stated above, whether the triplets were denied FAPE is not at issue in this case.

The dissent characterizes the result that our holding produces as "absurd," using that word at least four times. We do not agree and take comfort in the fact that the Department of Education interprets the "stay put" provision as we do.

## V. CONCLUSION

For the foregoing reasons, we affirm the judgments for the Board.

AFFIRMED.

14

BARKETT, Circuit Judge, dissenting:

I would agree with the majority's application of the "stay put" provision's plain language—that the pendency placement for a child applying for initial admission to public school is only the public school—if this case involved a situation for which that part of the provision was intended; that is, for a school-aged, disabled child who had never received services under the IDEA and was applying for initial admission to public school. The triplets in this case, however, <u>were</u> receiving services under later amendments to the IDEA, which were designed to promote the development of children <u>before</u> they reach school age and assure their smooth transition into school when they reach school age. Thus I believe the majority errs by finding as a matter of law that the receipt of these services did not entitle the triplets to the continuation of services pending resolution of their placement dispute.

Although we are generally to apply a statutory provision's plain language, we must read that language in context,[1] and consider the statute's overarching purpose

---

[1] See <u>In re International Admin. Serv., Inc.</u>, 408 F.3d 689, 708 n. 7 (11th Cir. 2005) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme . . . . We must therefore interpret the statute as a symmetrical and coherent regulatory scheme . . . and fit, if possible, all parts into an harmonious whole.") (citations and internal quotation marks omitted); <u>United States v. Ballinger</u>, 395 F.3d 1218, 1237 (11th Cir. 2005) ("[S]tatutory language must be read in the context of the purpose it was intended to serve.").

in order to avoid absurd results.[2] Congress enacted "stay put" provisions under both Part C and Part B of the IDEA—each of which, when read independently, prohibit the disruption of services during a placement dispute. Moreover, Congress made clear its intent that there be a smooth transition from one part of the statute to the other. Thus, it would be absurd to apply the "stay put" provision in a manner that reaches the completely opposite result: the <u>withdrawal</u> of existing services to a disabled child when she reaches school age.[3] Withdrawing necessary services at the moment of transition eviscerates the procedural protections Congress afforded parents who challenge a proposed change in services, disrupts the smooth transition Congress expressly intended for children transitioning from one program to the other, and

---

[2] <u>See</u> <u>Broward Gardens Tenants Ass'n v. U.S. E.P.A.</u>, 311 F.3d 1066, 1075-76 (11th Cir. 2002) (plain meaning of statutory language does not control if it would lead to truly absurd results). Although the majority takes issue with the use of the word "absurd" in this opinion, any reference to "absurd result" herein is merely a statement and application of the relevant legal standard for purposes of statutory interpretation.

[3] In this case, the School Board refused to continue, or pay for the continuation of, the "early intervention services" the triplets had been receiving when they turned 3 on January 4, 2004; that is, right in the middle of the school year.

Although the majority is correct that in this case the School Board ultimately offered the triplets placement at a private school for children with autism (in the form of a proposed "temporary" IEP about a month after refusing to continue early intervention services), no such placement is mandated by the majority's reading of "stay put." The only placement <u>required</u> under the majority's opinion is enrollment in the public schools. Moreover, there is no indication that the private school placement the School Board belatedly offered the triplets in this case would have included the particular one-on-one services which they had been receiving. Thus, this accommodation would not have been the same as continuing those services already deemed to be necessary and appropriate for these children. It is precisely the <u>continuation</u> of services pending a placement dispute that Congress sought to protect by enacting "stay put."

16

punishes children whose disabilities have been detected and addressed early under the statute, leaving them with no accommodation pending resolution of a placement dispute. The IDEA cannot reasonably be read to permit this result. Therefore, I respectfully dissent.

The "stay put" provision at issue was enacted in 1975, at a time when the IDEA's predecessor statute provided funding for special education and related services only to school-age children and did not provide for early intervention services to infants and toddlers. See Education for All Handicapped Children Act of 1975, S. 6, 94th Cong., 89 Stat. 773 (1975) ("EAHCA" or "the Act").[4] Because the statute did not yet provide for early intervention services to disabled infants and toddlers, its provisions were drafted with only school-age children in mind.[5] The "stay put" provision assured that, pending the resolution of a placement dispute, a school-age child applying for initial admission to public school would be guaranteed placement in the public school program (rather than be excluded on the basis of

---

[4] In 1990, Congress changed the name of the law to the "Individuals with Disabilities Education Act." See Education of the Handicapped Act Amendments of 1990, S. 1824, 101st Cong. § 901(a), 104 Stat. 1103, 1141 (1990).

[5] Specifically, the Act was designed to assure that a free and appropriate public education ("FAPE") was made available to handicapped children ages 6 and above, and provided incentives for States also to offer a FAPE to preschoolers between the ages of 3 and 5. EAHCA § 612(2)(B).

17

disability),[6] and that a child already in school with an educational placement under the IDEA would be entitled to maintain that placement until the dispute was resolved.[7] The dual purposes of this procedural safeguard were clear: to guarantee access to public school, on the one hand, and to maintain special educational services where those were already being provided, on the other. The drafters of this provision could not have intended, or even anticipated, that once Congress amended the statute to <u>also</u> provide grants for early intervention services to disabled infants and toddlers, this "stay put" provision would be construed against the interests of a disabled child to result in the <u>withdrawal</u> of services pending the resolution of a placement dispute.

More than a decade later, in 1986, Congress enacted what we now know as Part C of the IDEA to address the developmental disabilities of handicapped infants and

---

[6] Indeed, Congress passed the legislation after finding that a million handicapped children in the United States were "<u>excluded entirely</u> from the public school system . . . " <u>See</u> EAHCA § 3(b)(4) (emphasis added); <u>see also</u> <u>Honig v. Doe</u>, 484 U.S. 305, 323 (1988) (finding that by enacting the "stay put" provision, "Congress very much meant to strip schools of the unilateral authority they had traditionally employed to exclude disabled students . . . from school.").

[7] The "stay put" provision under Part B provides that, unless the school and parents otherwise agree,

> the child shall remain in [his or her] then-current educational placement . . . or, if applying for initial admission to a public school, shall, with the consent of the parents, be placed in the public school program until all such proceedings have been completed.

20 U.S.C. § 1415(j).

18

toddlers <u>before</u> those children reached school age (ages birth to 2, inclusive).[8] <u>See</u> Education of the Handicapped Act Amendments of 1986, S. 2294, 99th Cong., 100 Stat. 1145 § 101(a) (1986) ("1986 Amendments"). In passing this legislation, Congress recognized that certain special education needs could be mitigated if children's developmental disabilities were addressed before they reached the age of 3. Congress thus developed a program to help states identify handicapped infants and toddlers and provide "early intervention services" to those children and their families. <u>Id.</u> at §§ 676, 677. Entities receiving federal funding for this purpose were to develop "individualized family service plans" ("IFSPs") that would identify each child's developmental needs and the particular services required to meet those needs. <u>Id.</u> at § 677(d).

Notably, as it had done more than ten years before with Part B, Congress enacted a "stay put" provision for parents who disputed a proposed change in services now provided to handicapped infants and toddlers, to assure that those services too would be maintained during any dispute.[9] <u>Id.</u> at § 680(7). Congress additionally

---

[8] What is now Part C of the IDEA was originally designated as "Part H." For clarity, however, I refer to that section of the statute as "Part C" throughout.

[9] The "stay put" provision relevant to the infants and toddlers program provides:

During the pendency of any proceeding or action involving a complaint by the parents of an infant or toddler with a disability, unless the State agency and the parents otherwise agree, the infant or toddler shall continue to receive the appropriate

required that IFSPs state "the steps to be taken supporting <u>the transition of the handicapped toddler to [special education] services provided [to school age children]</u> under part B" where those services would be needed, <u>id.</u> at § 677(d)(7) (emphasis in original), thereby emphasizing the importance of a smooth transition from this new program into Part B.

As of 1986, then, it was clear that Congress intended to develop a framework for the continuous provision of services to handicapped children from birth through school age in order to promote their educational development. The 1986 amendments dovetailed with the existing law (providing for services for children ages 3 and up) by providing for early intervention services for children from birth to age 2, inclusive, and increasing the incentives to provide services for children ages 3 to 5.[10] The "stay put" provision pertaining to handicapped infants and toddlers guaranteed that parents could maintain the current level of early intervention services pending resolution of

---

> early intervention services currently being provided or, if applying for initial services, shall receive the services not in dispute.

20 U.S.C. § 1439(b)(2005).

[10] The requirement that attention be paid to the transition of handicapped infants and toddlers who would continue to require services when they reached school age protected against any interruption in services necessary for the child's development and education. Early intervention services were to include case management services designed to facilitate "the development of a transition plan to preschool services" where those would be needed. H.R. No. 99-860, at 8, <u>as reprinted in</u> 1986 U.S.C.C.A.N. 2401, 2408.

any dispute. Congress therefore intended that where services were provided under the IDEA (whether under Part B or Part C of the IDEA), those services would continue to be provided if a dispute arose as to a child's proper placement, until the dispute was resolved.

Indeed, Congress recognized that where early intervention and special education services would be provided by different entities, it would be "essential that the agencies coordinate their efforts to transition the child to the special education system operated by the local educational agency." H.R. No. 99-860, at 6, as reprinted in 1986 U.S.C.C.A.N. at 2407. The House Report also noted that speedy resolution of placement disputes in the infant and toddler program would be essential "because an infant's development is rapid and therefore undue delay could be potentially harmful." Id. at 14, as reprinted in 1986 U.S.C.C.A.N. at 2415.

Congress' intention to ensure a smooth transition from Part C to Part B became most prominent in the IDEA's 1991 amendments. See Individuals with Disabilities Education Act Amendments of 1991, S. 1106, 102nd Cong., 105 Stat. 587 (1991) ("1991 Amendments"). Congress expressly crafted those amendments "to facilitate the development of a comprehensive 'seamless' system of services for children, aged birth to 5, inclusive, and their families which will ensure . . . a smooth transition for children moving from early intervention programs under [Part C] to preschool

programs under part B . . . ." H.R. No. 102-198, at 4 (1991), as reprinted in 1991 U.S.C.C.A.N. 310, 313 (emphasis added). The House Report found that "it is critical that there will be no gap in services when a child turns three . . . " Id. at 7, as reprinted in 1991 U.S.C.C.A.N. at 316.

To this end, the 1991 amendments (1) require that state educational agencies establish policies and procedures for the smooth transition from early intervention services to special education services in preschool programs, including an assurance that either an IEP or an IFSP is being implemented by the disabled child's third birthday; (2) allow educational agencies, with the parents' consent, to continue using IFSPs as IEPs for children ages 3 to 5; (3) authorize states and local educational agencies to use preschool grants to provide a FAPE to 2-year old children with disabilities who will turn 3 during the school year; (4) require that personnel be trained to coordinate transition services for children moving from early intervention services to special education services in preschool programs; (5) make transition arrangements available that involve the family; and (6) guarantee the right of parents or guardians to determine whether a disabled infant or toddler will accept or decline an early intervention service without jeopardizing other early intervention services. See 1991 Amendments §§ 5; 7; 13; 15; 16; and 17.

In short, these amendments were unambiguously designed to assure

22

continuous services to disabled children from birth through school age notwithstanding any disputes and disagreements as to a child's placement. The majority errs by reading the "stay put" provision entirely outside this context and, having done so, reaches a result that is contrary to the history, design, and purpose of the IDEA. In order avoid an absurd result and give effect to the IDEA's procedural safeguards, we cannot read the "stay put" provision in isolation.

Nowhere could the absurd consequences of our failure to consider statutory language in context be clearer than under the facts presented in this case. The majority's interpretation of "stay put" allows for the actual <u>withdrawal</u> of services to the triplets in the middle of a school year (when they turned 3 years old), even though the School Board <u>failed to meet its statutory obligation</u> to have an IEP in place for the triplets when they reached the age of 3.[11] This ruling thus has the surely unintended effect of allowing a school board to abdicate its obligation to develop IEPs for disabled infants and toddlers about to transition, and leaving those children and their parents with no effective recourse during the pendency of a placement dispute.[12] A

---

[11] While the School Board may dispute the parents' allegations in this case, the posture of this appeal (as an appeal from the district court's grant of the School Board's motions to dismiss) requires us to accept those allegations as true.

[12] The majority contends that the reimbursement remedy is sufficient, because aggrieved parents can simply pay for private educational services on their own during the pendency of the placement dispute, and then sue to recover those expenses if it is later determined that the school denied the child a FAPE. While the Supreme Court has noted that "conscientious parents who have

procedural safeguard intended to protect the rights of disabled children during a placement dispute simply cannot reasonably be read to result in the withdrawal of services already identified as necessary to a child's educational development. This result is contrary to the purpose of the IDEA.

Relying solely on part of the "plain language" of the stay-put provision to conclude that the only placement for a disabled child who has reached school age and is therefore applying for initial admission to public school is a "public school program" with no accommodation, the majority rejects the argument that the existing IFSP may constitute the triplets' then-current educational placement, so as to entitle them to continuation of those services pending the resolution of their dispute with the School Board. For the foregoing reasons, concluding as a matter of law that existing IFSPs cannot constitute a current educational placement is inconsistent with the statute, when read as a whole, as well as with its intent and purpose. This conclusion is also inconsistent with our reasoning in <u>M.M. ex rel. C.M. v. Sch. Bd. of Miami-Dade County, Fla.</u>, 437 F.3d 1085 (11th Cir. 2006). In <u>M.M.</u>, we recognized that

---

adequate means and who are reasonably confident of their assessment" will often choose that course, <u>School Committee of Town of Burlington, Mass. v. Dep't of Educ. of Mass.</u>, 471 U.S. 359, 370 (1985), this is no remedy for parents who do not have the financial means to pay for private educational services in the first place. The IDEA's procedural safeguards promote access to a <u>free</u> and <u>appropriate</u> public education by protecting disabled children's <u>current educational placements</u> during a dispute <u>as well as</u> by providing for reimbursement when children are denied a FAPE under Part B and then seek private services on their own.

24

"early intervention services" previously provided under Part C—the same type of services the triplets had been receiving here—may also constitute "special education and related services" for purposes of establishing eligibility for reimbursement for private school expenses when a child is denied a FAPE.[13]  If "early intervention services" may constitute "special education services" for purposes of establishing eligibility for reimbursement under the IDEA, then they may also constitute a child's existing "educational placement" for purposes of "stay put."[14]  Like the triplets here, C.M. (the child of M.M.) had never been enrolled in public school (by virtue of not having yet reached school age), but had been provided early intervention services under the IDEA.  Even though C.M. had never been enrolled in public school, we held that her parents were eligible for reimbursement for private school expenses

---

[13] Section 1412(a)(10)(C)(ii) provides:

> If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary school or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.

20 U.S.C. § 1412(a)(10)(C)(ii) (emphasis added).

[14] To the extent that a particular IFSP does not contain an educational component, as defined under the IDEA, a school board would not be required to continue those services under this construction of "stay put."  All the IDEA requires is that schools make a FAPE accessible to children with disabilities through the provision of "special education and related services."

because the early intervention services C.M. had previously received constituted "special education and related services under the authority of a public agency" for purposes of the reimbursement provision. M.M., 437 F.3d at 1098. The majority errs by finding as a matter of law that the triplets did not have a current educational placement without considering, consistent with our case law, whether the "early intervention services" they received also constituted "special education and related services."

In Pardini v. Allegheny Intermediate Unit, 420 F.3d 181 (3d Cir. 2005), the Third Circuit found that Part B's "stay put" provision required the continuation of early intervention services to a child transitioning from Part C to Part B pending resolution of a placement dispute, because those services constituted the child's "educational placement," even though the child had not previously been admitted to public school. In reaching that conclusion, the Third Circuit took particular note of Congress' intention that children transitioning from Part C to Part B enjoy a smooth transition.[15] See id. at 191 ("Congress stressed that the amendments it added [to the IDEA] were 'designed to promote a seamless system of services for children with

---

[15] The Third Circuit also rejected the interpretation of "stay put" by the Department of Education, finding it to be unpersuasive in light of the purpose and design of the statute. Pardini, 420 F.3d at 191. Indeed, an agency interpretation is not entitled to deference when it is not based on a permissible construction of the statute. See Chevron v. Natural Res. Def. Council, 467 U.S. 837, 842-44 (1984).

disabilities, aged birth to five, inclusive.'") (citation omitted). Although the majority rejects our sister Circuit's decision in <u>Pardini</u> as "incorrectly decided," it fails to address how its ruling squares with our own reasoning in <u>M.M.</u>

For these reasons, I dissent.